**FAEGRE DRINKER BIDDLE & REATH LLP**
Zoë K. Wilhelm (SBN 305932)
zoe.wilhelm@faegredrinker.com
Joie C. Hand (SBN 342325)
joie.hand@faegredrinker.com
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Telephone: 310-203-4000
Facsimile: 310-229-1285

Matthew J. Fedor (admitted *pro hac vice)*
matthew.fedor@faegredrinker.com
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: 973-549-7000
Facsimile: 973-360-9831

***Attorneys for Defendant***
***Quest Diagnostics Incorporated***

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ANGELA COLE and BEATRICE ROCHE, individually and on behalf of all others similarly situated,
Plaintiffs,
v.

QUEST DIAGNOSTICS, INC.,
Defendant.

Case No. 1:22-cv-892-JLT-SKO

**DEFENDANT'S NOTICE OF MOTION AND MOTION TO DISMISS AND MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

Hearing January 17, 2023
Time: 9:00 a.m.
Ctrm: 4—7th Floor
Judge: Hon. Jennifer L. Thurston

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 17, 2023 at 9:00 a.m., or as soon thereafter as this matter may be heard, in the United States District Court for the Eastern District of California, located at 2500 Tulare Street, Fresno, California, in Courtroom 4 on the 7th Floor, before the Honorable Jennifer L. Thurston, Defendant Quest Diagnostics Incorporated ("Quest") will move the Court for an Order to dismiss Plaintiffs' Class Action Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. This Motion is based on this Notice of Motion and the Motion to Dismiss, the Memorandum of Points and Authorities, the Declaration of Michael Rigal ("Rigal Decl.") and exhibits thereto, the Declaration of Keena M. Hausmann ("Hausmann Decl.") and exhibits thereto, the Request for Judicial Notice and exhibits thereto, all other pleadings and papers on file in this action, any other such matters upon which the Court may take judicial notice, the arguments of counsel, and any other matter the Court may properly consider.

This Motion was filed after counsel for the parties met and conferred on October 25, 2022 about the issues in the accompanying memorandum of law.

**RELIEF SOUGHT**

Defendant seeks to dismiss the Class Action Complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for reasons identified in the accompanying Memorandum of Points and Authorities.

Dated: November 22, 2022

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Zoë K. Wilhelm*

Zoë K. Wilhelm
Matthew J. Fedor (admitted *pro hac vice*)
Joie C. Hand

***Attorneys for Defendant***
***Quest Diagnostics Incorporated***

**Table of Contents**


**Page**

I. INTRODUCTION ..... 1

II. STATEMENT OF FACTS ..... 2

A. The Parties ..... 2

B. MyQuest Account Terms & Conditions ..... 2

C. Quest's Cookie Notice and Privacy Notice ..... 3

D. Website Access and the Facebook Pixel ..... 6

E. Plaintiffs' Experience on Quest's Websites ..... 7

F. Plaintiffs' Unknown Facebook Status ..... 8

G. Plaintiffs' Claims ..... 9

III. LEGAL STANDARD ..... 10

A. Failure to State Claim Pursuant to Fed. R. Civ. P. 12(b)(6) ..... 10

IV. ARGUMENT ..... 10

A. Plaintiffs' CIPA and CMIA Claims Fail Because They Have Not Plausibly Alleged Lack of Consent to the Collection of Information About Their Website Visits ..... 10

B. Plaintiffs' CIPA Claim Fails Because They Did Not Plausibly Allege that the "Contents" of Their Website Communications Were Intercepted ..... 13

C. Plaintiffs' CIPA Claim is Preempted by Federal Law ..... 16

D. Plaintiffs' CMIA Claim Fails Because None of the Information Allegedly Disclosed or Used Constitutes "Medical Information" ..... 17

E. Plaintiffs' CMIA claim fails because they do not allege that Quest was the party that disclosed or used the information at issue. ..... 19

V. CONCLUSION ..... 20

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Applied Underwriters, Inc. v. Lara*,
530 F. Supp. 3d 914 (E.D. Cal. 2021) .......... 2

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 10

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 10

*Brodsky v. Apple, Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) .......... 14

*Bunnell v. Motion Picture Ass'n of Am.*,
567 F. Supp. 2d 1148 (C.D. Cal. 2007) .......... 16

*Eichenberger v. ESPN, Inc.*,
2015 WL 7252985 (W.D. Wash. May 7, 2015) .......... 19

*Eisenhower Medical Center v. Superior Court*,
226 Cal. App. 4th 430 (Cal. Ct. App., 4th Dist. 201 .......... 18

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F. 3d 589 (9th Cir. 2020) .......... 14

*Fayer v. Vaughn*,
649 F. 3d 1061 (9th Cir. 2011) .......... 10

*Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*,
868 F. Supp. 2d 983 (E.D. Cal. 2012) .......... 2

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) .......... 12

*In re Google Assistant Privacy Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 11

*In re Google Inc. Street View Elec. Commc'ns Litig.*,
794 F. Supp. 2d 1067 (N.D. Cal. 2011) .......... 16

*Hammerling v. Google LLC*,
2022 WL 2812188 (N.D. Cal. July 18, 2022) .......... 14, 15

*Heller v. Norcal Mut. Ins. Co.*,
8 Cal. 4th 30 .......... 11

*In re Hulu Privacy Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ........ 19

*Jackson v. Jamaica Hosp. Med. Ctr.*,
61 A.D.3d 1166 (N.Y. Sup. Ct. App. Div. 2009)........ 19

*Leong v. Carrier IQ Inc.*,
2012 WL 1463313 (C.D. Cal. Apr. 27, 2012) ........ 17

*Lopez v. Wash. Mut. Bank, FA*,
302 F. 3d 900 (9th Cir. 2002)........ 16

*McClellan v. I-Flow Corp.*,
776 F. 3d 1035 (9th Cir. 2015)........ 16

*In re Nickelodeon Consumer Privacy Litig.*,
827 F. 3d 262 (3d Cir. 2016)........ 19

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ........ 11, 12

*Quon v. Arch Wireless Operating Co., Inc.*,
445 F. Supp. 2d 1116 (C.D. Cal. 2006) ........ 16

*Regents of Univ. of Cal. v. Superior Court*,
220 Cal. App. 4th 549 (Cal. Ct. App. 2013) ........ 20

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015)........ 19

*Shively v. Carrier IQ, Inc.*,
2012 WL 3026553 (N.D. Cal. 2012)........ 17

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021)........ 12

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ........*passim*

*Smith v. Facebook, Inc.*,
745 F. Appx. 8 (9th Cir. 2018)........ 12, 13

*Stasi v. Inmediata Health Grp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020)........ 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........ 2

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) ........ 17

*Wilson v. Rater8, LLC*,
2021 WL 4865930 (S.D. Cal. Oct. 18, 2021) .................... 18, 19

*Yoon v. Lululemon USA, Inc.*,
549 F. Supp. 3d 1073 (C.D. Cal. 2021) .................... 15

*In re Zynga Privacy Litig.*,
750 F. 3d 1098 (9th Cir. 2014).................... 14, 15

**Statutes, Rules & Regulations**

18 U.S.C. § 2511 .................... 2

18 U.S.C. § 2511(4) .................... 17

18 U.S.C. § 2518(10)(c).................... 16, 17

18 U.S.C. § 2520(b) .................... 17

Fed. R. Civ. P. 12(b)(6).................... 10

Cal. Civ. Code § 56.05(i) .................... 17

Cal. Civ. Code § 56.10(a) .................... 11, 20

Cal. Civ. Code § 56.10(d) .................... 11, 20

Cal. Pen. Code § 631.................... 1

Cal. Pen. Code § 631(a) .................... 1, 10, 13

## I. INTRODUCTION

This case is part of a wave of recent litigation against website owners regarding use of the "Facebook Pixel," publicly available "code" that uses "cookies" to collect information regarding user activity on websites to understand and measure interest in products and services, and to better serve users. Plaintiffs assert that the installation of the Facebook Pixel on websites owned by Quest Diagnostics Incorporated[1] enabled Facebook[2] to collect information regarding Plaintiffs' use of Quest's websites. Plaintiffs claim Facebook "intercepted" and "eavesdropped" on their internet communications with Quest in violation of the California Invasion of Privacy Act, Cal. Pen. Code § 631 ("CIPA"). Rather than sue Facebook, Plaintiffs have asserted a CIPA claim against Quest, alleging that it "aided, agreed with, and conspired" to assist Facebook with violating CIPA. Plaintiffs also allege improper disclosure or use of unspecified "medical information" in violation of the Confidentiality of Medical Information Act ("CMIA"). Plaintiffs seek statutory damages under CIPA and CMIA on behalf of a California class of Quest website users.

The Court should dismiss the Complaint because Plaintiffs have failed to plausibly allege a viable claim under either CIPA or CMIA.[3] ***First***, lack of consent/authorization is an element of Plaintiffs' CIPA and CMIA claims, and Plaintiffs have failed to plausibly allege that they did not consent to the data collection practices at issue. In fact, Plaintiffs' allegations indicate they *did* consent by agreeing to Quest's Cookie Notice and Privacy Notice, which disclose that Quest uses cookies that collect data regarding website user activity, including third-party cookies that may be used for advertising. Additionally, although Plaintiffs conspicuously omit from the Complaint any details about whether they are Facebook users, Plaintiffs also may have agreed to the data collection practices at issue by agreeing to Facebook's various policies.

***Second***, Plaintiffs' CIPA claim fails because they have failed to plausibly allege that the use of the Pixel caused the "contents" of their internet communications to be intercepted within the meaning of CIPA. Cal. Pen. Code § 631(a).

---

[1] Quest was erroneously named as "Quest Diagnostics, Inc."
[2] For ease of reference and to remain consistent with Plaintiffs' use of defined terms, Quest refers to Meta Platforms, Inc. by its former name, Facebook.
[3] Concurrently with this Motion to Dismiss, Quest has filed a separate Motion to Transfer Venue pursuant to a forum-selection clause.

***Third***, Plaintiffs' CIPA claim is preempted by the federal Wiretap Act, 18 U.S.C. § 2511.

***Fourth***, Plaintiffs' CMIA claim fails because none of the information at issue constitutes "medical information" under the statute. Moreover, Plaintiffs failed to allege that any of *their* personally identifiable information was disclosed, as is required under CMIA.

***Fifth***, Plaintiffs' CMIA claim fails because Plaintiffs failed to plausibly allege that *Quest* affirmatively disclosed or used the information at issue. Indeed, Plaintiffs' entire theory is that *Facebook* intercepted the communications and that Quest aided and abetted *Facebook's* interception by installing the Pixel on Quest's websites. But CMIA does not impose liability for allegedly aiding and abetting a third party's alleged interception of medical information.

## II. STATEMENT OF FACTS[4]

### A. The Parties

Quest is a leading provider of diagnostic services, providing clinical laboratory testing to millions of customers. Compl. ¶ 2. Among the websites Quest operates are www.questdiagnostics.com (the "General Website"), which can be accessed by the public at large, and myquest.questdiagnostics.com ("MyQuest"), which requires users to login via an account. *Id.* ¶ 1.[5]

Plaintiffs Angela Cole and Beatrice Roche both reside in California. Cole alleges that she created a MyQuest account in or around August 2019, and Roche alleges that she created a MyQuest account in or around March 2022. *Id.* ¶¶ 4-5.

### B. MyQuest Account Terms & Conditions

To create MyQuest accounts on the MyQuest website, users must go through a multi-step process and enter various information (name, address, email, etc.). Rigal Decl. ¶ 4.[6] At the third and

---

[4] For purposes of this motion, Quest assumes the truth of all well-pleaded allegations in the Complaint.

[5] The Complaint refers to "myquest.questdiagnostics.com" as the "Patient-Protected Website."

[6] On a motion to dismiss, courts may look "at documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Applied Underwriters, Inc. v. Lara*, 530 F. Supp. 3d 914, 923 (E.D. Cal. 2021), *aff'd on other grounds,* 37 F. 4th 579 (9th Cir. 2022) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)); *Foster Poultry Farms v. Alkar-Rapidpak-MP Equip., Inc.*, 868 F. Supp. 2d 983, 990 (E.D. Cal. 2012) ("In a motion to dismiss, a Court may take judicial notice of documents attached to or *referenced* in the complaint without converting the motion into one for summary judgment where the authenticity of the documents are not in dispute." (internal citation omitted)). Here, Plaintiffs allege they signed up for MyQuest accounts and their access to those accounts and use of Quest's websites generally is integral to their allegations. They also quote certain aspects of the General Website (namely,

final step of the process, users must click a green button at the bottom of the screen that reads, "Create Account." *Id.* ¶ 5 & Ex. A. The last text on the screen before the "Create Account" button is a section with the heading "Terms & Conditions" written in bold text, where users are informed that "By clicking 'Create account' I accept the Terms and Conditions." *Id.* The words "Terms and Conditions" are a hyperlink in green font, which is different than the color of the surrounding text. *Id.*

Clicking on the Terms and Conditions hyperlink opens the full text of the "Quest Diagnostics Patient Registration: Terms and Conditions" ("Account Terms & Conditions"). *Id.* ¶ 6. If the user does not click the "Create Account" button and accept the Account Terms & Conditions, a MyQuest account is not created. *Id.* ¶ 7.

The opening paragraph of the Account Terms & Conditions states: "By accessing or using the Account Service, you agree to be bound by these terms and conditions (this 'Agreement')." *Id.*, Ex. B. The paragraph entitled "Scope of Service" states "[t]his Agreement applies to your use of the Account Service," which "provides a variety of content, products and services, including diagnostic health testing and services, data analysis, … and the ability to connect with third parties." *Id.*

### C. Quest's Cookie Notice and Privacy Notice

All visitors to Quest's website are subject to Quest's Cookie Notice and Privacy Notice. In this regard, a pop-up banner on the General Website states:

> ***We and our partners use cookies to enhance user experience, analyze performance and traffic on our website, and personalize content. We also share information about your use of our website with our advertising and analytics partners***. For more information on our use of cookies and information about your use of our site, please see our **Cookie Policy** and **Privacy Policy**. You can also manage your cookie choices by visiting Cookie Settings.

Hausmann Decl. ¶ 10, Ex. E (italicized emphasis added). "Cookie Policy" and "Privacy Policy" are in bold text and are hyperlinks that, when clicked, take users to the Cookie Notice and Privacy Notice, respectively. *Id.* ¶ 11. Visitors can click "Accept Cookies" or "Cookie Settings," the latter of which takes the visitor to the "Privacy Preference Center," which further explains:

---

Quest's Cookie Notice) in their Complaint. *Id.* ¶ 40, figs. 12 & 13. Thus, the Account Terms & Conditions, the Cookie Notice, the related Privacy Notice, and other aspects of the websites are all incorporated by reference and the Court may consider them. In the alternative, all of these items are available on Quest's websites and are properly subject to judicial notice.

> **When you visit our website, we store cookies on your browser to collect information about you, your preferences, or your device** in order to make the site work as you expect it to and **to provide a more personalized web experience**. You can choose not to allow certain types of cookies, but that may impact your experience of our website and the services we are able to offer. Click on the different category headings to find out more about the different kinds of cookies we use.

*Id.* ¶ 12, Ex. F (emphasis added). The Privacy Preference Center allows visitors to not allow use of certain cookies. *Id.* If a website visitor does not interact with the pop-up banner on the homepage, it continues to appear on certain other pages. *Id.* ¶ 12.

Quest's Cookie Notice further explains that Quest uses "cookies to track responses and views of our advertisements," as well as "pixels." *Id.* ¶ 9, Ex. D. The Cookie Notice describes specific types of cookies Quest uses and what information each will collect. *Id.* Plaintiffs quote portions of Quest's Cookie Notice in the Complaint that detail Quest's use of "Performance Cookies" and "Targeting Cookies." Compl. ¶ 40, figs. 12 & 13.

Performance Cookies "collect information about how visitors use a website [but] do not collect information that identifies a specific visitor." Compl. ¶ 40, fig. 13. The information Quest "gather[s] through performance cookies is used to improve how the websites work, to help us evaluate website usage, **makes our marketing more relevant**, and improves your experience." *Id.* (emphasis added).

Targeting Cookies "**are used to deliver online advertisements both on and off websites visited that may be more relevant to visitor interests based on activity from a website being browsed and based on a profile built of visitor interests**." Compl. ¶ 40, fig. 12 (emphasis added). Quest informs website visitors that "**We use targeting cookies…on our sites to help us promote Quest's products and services to you on *other* sites and platforms. *We also allow third parties to place cookies on our websites*, and information collected via these cookies is used to provide you with information that may be of interest to you based on your activities on our websites**." *Id.* (emphasis added). Quest further explains that the Targeting Cookies "do not directly store personal information…but store unique identifiers that identify to us and our partners a particular visitor's browser and/or device." *Id.*

Quest's Privacy Notice states that Quest collects "information online automatically when you visit our websites or applications," and expressly incorporates the Cookie Notice. Hausmann Decl., Ex. B. Quest explains that it collects information such as "your IP address, browser types, operating system, device types and device IDs or advertising identifiers." *Id.* The Privacy Notice further explains that Quest collects "**browsing activity…what pages you visit** and **what you click**," and other "similar information." *Id.* (emphasis added). Quest then discloses that it uses this data "to provide information, products or services," "**develop and carry out marketing, advertising** and analytics," and "deliver content and products or services relevant to your interests." *Id.* (emphasis added). The Privacy Notice further states that Quest will share information with third parties "to manage or support some of our business operations and services." *Id.*

MyQuest users also separately agree to Quest's Privacy Notice and Cookie Notice via their agreement to the Account Terms & Conditions. *See* Rigal Decl. ¶ 8. Specifically, the Account Terms & Conditions contain a section entitled "Use of Your Information/Privacy Policy" which explains:

> If You create, transmit, or display information while using the Quest Diagnostics Account Service, You may provide only information that you own or have the right to use. Quest Diagnostics will only use information You provide as permitted by the Online Privacy Policy, and applicable law. The purpose of our Online Privacy Policy is to identify the information We collect online, the steps We take to protect it and Your choices regarding how that information is used.

Rigal Decl., Ex. B § 4. The words "Online Privacy Policy" are in blue font and contain a hyperlink that, when clicked, takes the user to Quest's Privacy Page (questdiagnostics.com/our-company/privacy), which contains links to the aforementioned Cookie Notice and Privacy Notice, and explains that these notices "provide information about [Quest's] privacy practices on our websites or applications that link to them." *Id.*, ¶ 8 & Ex. B § 4.[7]

[7] The current Cookie Notice has been in effect since December 17, 2020. Hausmann Decl. ¶ 9. The version of the Privacy Notice in effect at the time Plaintiffs filed the Complaint went into effect June 8, 2021; it was recently updated in August 2022, and then again in September. Hausmann Decl. ¶¶ 7-8. Over time, Quest has had different iterations of the Cookie Notice and Privacy Notice, and the policies have had slightly different names. *Id.* ¶ 6. In 2019, for example, Quest had an "Online Privacy Policy" and a "Website Cookies Notice and Disclosure Statement." *Id.* Plaintiff Roche allegedly visited Quest's websites in March 2022 and Plaintiff Cole allegedly visited Quest's

### D. Website Access and the Facebook Pixel

A brief explanation of what happens when an individual visits a website is necessary to understand the context of Plaintiffs' claims. Using the example from the Complaint, when an individual navigates to a host website such as Quest's General Website, the visitor's internet browser (*e.g.*, Google Chrome, Safari, or Microsoft Edge) "sends a GET request" to the host website "server requesting that [host website] server to load the particular webpage" Uniform Resource Locator ("URL") on the visitor's browser. Compl. ¶¶ 15, 17.

The Facebook Pixel is a "piece of code" that website owners such as Quest "can integrate into their website" to understand certain visitor activity. *Id.* ¶¶ 14-16. The Pixel and other Facebook "Business Tools" "help website owners…understand and measure their products and services, and better reach and serve people." *Id.* ¶ 14, n.16.

Plaintiffs allege that the Pixel allows "Facebook to intercept and collect user activity" on the host website. *Id.* ¶¶ 14, 16. Specifically, when visitors access a website that has integrated the Pixel, Facebook's software script directs the visitor's browser to send a separate message to Facebook's servers containing "the original GET request sent to the host website" and "additional data" the Pixel is "configured to collect." *Id.* ¶ 16. This "additional data" allegedly includes "PageView," "ButtonClick," and "Microdata" information. *Id.* ¶¶ 27-28.

PageView information is the URL (*i.e.*, the specific webpage) accessed by the visitor. *Id.* ¶¶ 24-25. The two examples in the Complaint—which, to be clear, are *not* alleged to be from Plaintiffs' own visitor experiences—are https://www.questdiagnostics.com/healthcare-professionals/about-our-tests/allergy-asthma and https://myquest.questdiagnostics.com/results /4jkE3XHNNBR97gS1XIO_-Q%3D%3D/prsID/FzMFvgj0FzrJkM4cUzKprQ%3D%3D. *Id.* ¶ 24, figs. 5 & 6. As to "ButtonClick" and Microdata" information, Plaintiffs inserted two pictures in the Complaint that offer no insight into what additional information they are alleging the Pixel collects beyond the PageView information. *Id.* ¶ 27, figs. 7 & 8. Regardless, Plaintiffs insist that PageView,

---

websites in August 2019. For ease of reference, this memorandum focuses on the policies in effect at the time the Complaint was filed because Plaintiffs made no attempt to distinguish between the various policies over different points in time, have not plausibly alleged lack of consent (as discussed *infra*), and do not state whether they are Facebook users and whether or when they agreed to Facebook's policies (also discussed *infra*).

Microdata, and ButtonClick information is part of "the contents and meaning of a user's electronic communication." *Id.* ¶ 28.

### E. Plaintiffs' Experience on Quest's Websites

Plaintiffs allege that at the time they each created their MyQuest accounts they visited Quest's websites to obtain unspecified diagnostic test results. *Id.* ¶¶ 4-5. Each Plaintiff identically alleges that she "navigated to the General Website"—presumably the homepage—which redirected her to MyQuest, where she created an account. *Id.* Next, each Plaintiff alleges that, after creating an account, she "checked her [diagnostic test] results through [MyQuest]." *Id.* Plaintiffs allege no additional visits to either the General Website or MyQuest.

Plaintiffs allege that when visitors access MyQuest, the Facebook Pixel "intercept[s] and transmit[s]" PageView information and "transmits the URL accessed." *Id.* ¶¶ 24-25. Plaintiffs claim that this PageView information "transmits information showing, at a minimum, that a patient has received and is accessing test results." *Id.* ¶ 26. Plaintiffs do not allege that the MyQuest information reveals what diagnostic test any visitors took, or what the results were.

As to the General Website, Plaintiffs allege that the Facebook Pixel "intercept[s] and transmit[s]" PageView information, as well as ButtonClick and Microdata information. Compl. ¶¶ 26-27. Notably, Plaintiffs do not identify any specific buttons they may have clicked on the General Website such that *their* ButtonClick information might have been intercepted. Plaintiffs do not allege that any PageView information beyond Quest's homepage, the MyQuest homepage, and the general test results page URL was intercepted. Nor do Plaintiffs identify any Microdata that allegedly was intercepted during their visits. Finally, Plaintiffs do not suggest that any information from the General Website revealed what diagnostic test they took, or what the results were.

Plaintiffs also allege that the Facebook Pixel "intercept[ed] and collect[ed] personally identifiable information" through the use of first-party and third-party cookies.[8] *Id.* ¶¶ 28-29, 37. In support of this allegation, Plaintiffs identify three distinct categories of website visitors. First are visitors who are logged into Facebook when they visit Quest's websites. These visitors "transmit

---

[8] First-party cookies are created by the website the visitor is visiting (*e.g.*, Quest's websites). Third-party cookies are created by a website with a domain name other than the one the visitor is currently visiting (*e.g.*, Facebook). Compl. ¶ 37.

the c_user cookie to Facebook"—a third-party cookie—which contains that user's "unencrypted Facebook ID," among other third-party cookies. *Id.* ¶ 30. The second category consists of visitors who "recently" logged out of their Facebook accounts. For these visitors, "Facebook compels the visitor's browser to send a smaller set" of third-party cookies including the "fr cookie" which contains "an encrypted Facebook ID and browser identifier" and the "datar cookie" which "identifies a browser." *Id.* ¶¶ 31-32. The third category consist of visitors who never created Facebook accounts. For these visitors, the "fr cookie" contains "an abbreviated and encrypted value that identifies the browser" and the "_fbp cookie" contains "an unencrypted value that uniquely identifies a browser." *Id.* ¶¶ 33-34. Plaintiffs allege that Facebook uses the "c_user", "fr", and "_fbp" cookies "to pair event data with personally identifiable information so it can later retarget patients on Facebook." *Id.* ¶ 39. Significantly, however, Plaintiffs do not allege that any of the information collected by these cookies was disclosed or used by Quest—or even that it was in Quest's possession in the first place.

### F. Plaintiffs' Unknown Facebook Status

Despite Plaintiffs' effort to distinguish the three categories of website visitors and what information is allegedly intercepted for each, conspicuously missing from the Complaint are any allegations regarding their own Facebook status at the time they accessed Quest's websites. Plaintiffs do not say whether they were Facebook users or, if so, whether they had recently been logged into or logged out of Facebook on the same browser such that any particular type of cookie information (*e.g.*, a Facebook ID as opposed to browser identifier) might have been intercepted.

This is a material omission for several reasons. First, as a practical matter, Plaintiffs are not identifying what information *about them* allegedly was collected and/or disclosed when they visited Quest's websites. Second, and equally important, is that by omitting the details regarding their own Facebook status, it is unclear whether Plaintiffs may have consented to certain data being collected by or disclosed to Facebook merely by virtue of being a Facebook user. Indeed, Facebook has an extensive set of contract terms and policies that implicate the collection and sharing of data for registered Facebook users, including a Terms of Service, a Privacy Policy, and a Cookies Policy. For example, the current Facebook Terms of Service states that, by using Facebook's products,

"you agree that we can show you ads" and to "use your personal data to help determine which ads to show you." Request for Judicial Notice ("RJN"), Ex. 1. Facebook's current Privacy Policy further explains that the "[t]he information we collect and process about you depends on how you use our Products." *Id.*, Ex. 2. The Privacy Policy states that Facebook collects information about device systems and operations, device identities, and cookie data. *Id.*, Ex. 2. Further, that policy discloses that Facebook "Partners,"[9] such as Quest, may share with Facebook "a variety of your information and activities," through the use of Facebook's Business Tools (which include the Pixel) and that "[w]e receive this information whether or not you're logged in." *Id.*, Ex. 2 ("Information from Partners, vendors and third parties."). Facebook users are informed that those Partners provide "your device information," "[w]ebsites you visit [(*i.e.*, URL)] and cookie data," "purchases and transactions you make," "[t]he ads you see and how you interact with them," and "[h]ow you use [Facebook's] Partners' products and services." *Id.* That policy also explains to users how they may "[t]ake control" of their personal information. *Id.*

Facebook's Cookies Policy explains that cookies provide Facebook with the ability to personalize content, measure advertisement performance, and secure the user experience. RJN, Ex. 3. And Facebook's Cookies Policy informs users how to control their information and how Facebook uses it. *Id.*

### G. Plaintiffs' Claims

Plaintiffs claim that Quest violated CIPA because it allegedly "aided, agreed with, and conspired with Facebook" to enable Facebook to track and intercept internet communication while Plaintiffs and putative class members were accessing Quest's General Website and MyQuest. Compl. ¶ 58. According to Plaintiffs, their communications with Quest's websites were intercepted "without authorization and consent from Plaintiffs and Class members." *Id.*

Plaintiffs also claim that Quest violated CMIA, though their allegations here are somewhat confusing. Plaintiffs allege that "Defendant's Pixel disclosed medical information because it transmitted a patient's Facebook ID and other Facebook identifiers, which constitute individually

---

[9] Examples of Facebook "Partners" include advertisers, companies that measure ad effectiveness, and other businesses that use Facebook products to sell or offer goods and services. RJN, Ex. 2.

identifiable information, alongside event data that disclosed the URL of the webpage a patient accessed to review test results." *Id.* ¶ 67. But the only Pixel that Plaintiffs identified in the Complaint is the *Facebook* Pixel, and Facebook is not a defendant here. Plaintiffs do not allege any facts suggesting that Quest ever received or shared with Facebook a patient's Facebook ID or other Facebook identifiers. And, as noted, Plaintiffs do not allege their own Facebook status; thus, it is unclear what "identifiers" they are claiming were shared. In addition to their individual claims, Plaintiffs seek to represent a putative class of "all persons in California who have navigated and accessed" the General Website and/or MyQuest. *Id.* ¶ 43.

## III. LEGAL STANDARD

### A. Failure to State Claim Pursuant to Fed. R. Civ. P. 12(b)(6)

Plaintiffs' entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "The pleading must contain something more than a statement of facts that merely creates a suspicion of a legally cognizable right of action," and must "raise a right to relief above the speculative level." *Id.* (cleaned up). That is, the claim must be "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court need not "assume the truth of a legal conclusions merely because they are cast in the form of factual allegations." *Fayer v. Vaughn*, 649 F. 3d 1061, 1064 (9th Cir. 2011).

## IV. ARGUMENT

### A. Plaintiffs' CIPA and CMIA Claims Fail Because They Have Not Plausibly Alleged Lack of Consent to the Collection of Information About Their Website Visits

Plaintiffs have failed to plausibly allege facts suggesting they did not consent to or authorize the collection of information about their visits to Quest's websites by the Facebook Pixel. This is fatal to both their CIPA and CMIA claims.

By its plain language, CIPA applies only to one "who willfully *and without the consent of all parties* to the communication…attempts…to learn the contents or meaning of any…communication." Cal Pen. Code § 631(a) (emphasis added). CMIA prohibits a health care provider from disclosing "medical information regarding a patient…without first obtaining an



FAEGRE DRINKER BIDDLE & REATH LLP
ATTORNEYS AT LAW
LOS ANGELES

authorization," and further provides that "[e]xcept to the extent expressly authorized by a patient … a provider of health care … shall not intentionally share, sell, use for marketing, or otherwise use medical information for a purpose not necessary to provide health care services to the patient." Cal. Civ. Code § 56.10(a), (d); *see Heller v. Norcal Mut. Ins. Co.*, 8 Cal. 4th 30, 38 ("to violate [CMIA], a provider of health care must make an unauthorized, unexcused disclosure of privileged medical information"). As courts have observed, "[t]here may be subtle differences" among consent doctrines, but "the question under [each] is essentially the same: Would a reasonable user who viewed [the defendant's] disclosures have understood that [it] was collecting [the information at issue]?" *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014).

To be sure, Plaintiffs say their internet communications with Quest's websites were intercepted by Facebook "without authorization and consent from Plaintiffs and Class members." Compl. ¶ 58. But this conclusory allegation is little more than a formulaic recitation of the lack of consent elements of a CIPA and CMIA claim, which is not enough to state a plausible claim for relief. *In re Google Assistant Privacy Litig.*, 457 F. Supp. 3d 797, 828 (N.D. Cal. 2020) (dismissing CIPA claim and noting that "Plaintiffs' allegation that the recordings 'were made without Plaintiffs' consent' is conclusory").

The implausibility of Plaintiffs' conclusory allegations about lack of consent is evident from Quest's broad disclosures about data collection and the use of third-party cookies to General Website visitors and MyQuest accountholders. For example, Quest's Cookie Notice states:

> **We use targeting cookies … on our sites to help us promote Quest's products and services to you on *other sites* and platforms. *We also allow <u>third parties</u> to place cookies on our websites*, and information collected via these cookies is used to provide you with information that may be of interest to you *based on your activities on our websites*.** These targeting cookies … store unique identifiers that identify to us and our partners a particular visitor's browser and/or device.

Compl. ¶ 40, fig. 12 (emphasis added). Quest's Privacy Notice also discloses that Quest collects "information online automatically," such as "IP address, browser types, operating system, device types and device IDs or advertising identifiers," and "browsing activity" such as "what pages you visit and what you click." Hausmann Decl., Ex. B. Quest discloses that it uses this information "to

develop and carry out marketing, advertising and analytics" and clearly explains that it may share such information with third parties. *Id.*

Plaintiffs acknowledge the Cookie Notice in the Complaint. Comp. ¶ 40, Figs. 12 & 13. As discussed above, General Website visitors agree to Quest's Cookie Notice and Privacy Notice when they visit the General Website. And MyQuest accountholders agree to the Cookie Notice and Privacy Notice during the registration process by agreeing to the Account Terms & Conditions, *supra* at pp. 2-5. But Plaintiffs inexplicably plead no facts to explain why consent is somehow lacking despite these policies, which disclose the very conduct they challenge and enable users to disallow certain types of cookies if they so choose.[10]

In *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd* 745 F. Appx. 8 (9th Cir. 2018), the court granted a motion to dismiss CIPA claims arising from Facebook's collection of the plaintiffs' web browsing activity on several healthcare websites using Facebook's Business Tools (such as pixels and cookies). The court found that the plaintiffs' CIPA and other statutory claims were barred because they consented to Facebook's activity when they signed up for Facebook accounts and agreed to Facebook's Cookies Policy and Privacy Policy, which "discloses the precise conduct at issue"—just like Quest's Cookie Notice and Privacy Notice do here. *Id*. at 953-955. Other "[c]ourts consistently hold that terms of service and privacy policies … can establish consent to the alleged conduct challenged under various states wiretapping statutes and related claims," including CIPA. *Silver v. Stripe Inc.*, 2021 WL 3191752, at *4 (N.D. Cal. July 28, 2021) (dismissing federal Wiretap Act and CIPA claim because plaintiffs agreed to a privacy policy that "explicitly state[d] that a consumer's information may be provided to [the defendant's] 'partners'"); *see also Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1136 (N.D. Cal. 2015) (stating "lack of consent is an express element of a [CIPA] claim" and finding plaintiff consented to sharing of personal data by virtue of agreeing to defendant's privacy policy); *Perkins*, 53 F. Supp. 3d at 1213 (dismissing federal Wiretap Act claim and finding plaintiffs consented to collection of

[10] Plaintiffs also allege that "Defendant has failed to receive consent from visitors to intercept their communications." Compl. ¶ 41. But Plaintiffs did not—and cannot—allege that *Quest* intercepted any of their communications because Quest is a party to the communications, thus this allegation makes no sense and is irrelevant.

information "[i]n light of the clarity of the disclosure, the proximity of the disclosure to the wrongful conduct, and the ability to opt out").

The holding in *Smith* raises even more concerns about the plausibility of Plaintiffs' allegations about purported lack of consent due to Plaintiffs' failure to allege any details about their Facebook status. Like in *Smith*, Plaintiffs' claims here are based on *Facebook's* alleged collection of information. Depending on if, and when, Plaintiffs registered for Facebook accounts, they may have expressly consented to Facebook collecting their browsing activity and other data regarding their website use through tools such as the Pixel just like the plaintiffs in *Smith*. *See Smith*, 262 F. Supp. 3d at 953; *see also* RJN, Exs. 1-3 & *supra* at pp. 8-9. Notably, in *Smith* the plaintiffs argued that "the collection of health-related data" fell outside of the scope of Facebook's policies because it was somehow "qualitatively different" or "sensitive." 745 F. Appx. at 9. The Ninth Circuit expressly rejected that argument, finding that the data could not "reveal details of an individual's health status or medical history" and, in any event, "many other kinds of information are equally sensitive." *Id.* In response to the plaintiffs' claim that such data was subject to the "stringent disclosure requirements" under HIPAA, the court explained that "the connection between a person's browsing history and his or her own state of health is too tenuous" to fall within the sweep of health information laws. *See id.* Accordingly, Facebook's conduct fell "within the scope of Plaintiffs' consent to Facebook's Terms and Policies." *Id.*

Simply put, Plaintiffs did not—and likely cannot—plausibly allege the requisite lack of consent. Plaintiffs cannot circumvent the plausibility requirement through artful pleading or omitting key facts. Accordingly, the Court should dismiss Plaintiffs' CIPA and CMIA claims.

### B. Plaintiffs' CIPA Claim Fails Because They Did Not Plausibly Allege that the "Contents" of Their Website Communications Were Intercepted

CIPA is implicated only if the alleged violator "learn[s] the *contents* or meaning of any message, report, or communication." Cal. Pen. Code. § 631(a) (emphasis added). Plaintiffs' CIPA claim fails because they did not—and cannot—plausibly allege that Facebook learned the "contents" of any of Plaintiffs' internet communications with Quest's websites.

The Ninth Circuit has found that "contents" means "the intended message conveyed by the communication" as opposed to "record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Privacy Litig.*, 750 F. 3d 1098, 1106 (9th Cir. 2014).[11] In the context of website communications, "[c]ourts employ a contextual 'case-specific' analysis hinging on 'how much information would be revealed' by the information's tracking and disclosure" to determine whether it constitutes the "contents" of a communication. *Hammerling v. Google LLC*, 2022 WL 2812188, at *13 (N.D. Cal. July 18, 2022).

For example, in *Zynga*, the Ninth Circuit held that "the address of the webpage" (*i.e.*, the URL) did "not meet the definition of 'contents,' because these pieces of information are not the 'substance, purport, or meaning' of a communication." *Id.* at 1107. The Court recognized that a referer header (which includes the URL) could disclose that a person viewed the "page of a gay support group," but nevertheless concluded that such URLs "function[] like an 'address,'" and not "content." *Id*. at 1107-08. The *Zynga* Court acknowledged there could be circumstances where a URL potentially "could amount to a disclosure of the contents of a communication" if, for example it divulged specific search terms input by the visitor. *Id.* at 1108-09. Although not in the context of evaluating "contents" within the meaning of CIPA, in another case the Ninth Circuit found that the plaintiffs adequately alleged that they had a reasonable expectation of privacy in a "full-string detailed URL, which contains the name of a website, folder and sub-folders on the web-server, and the name of the precise file requested," and which included "the particular document within a website that a person views." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F. 3d 589, 605 (9th Cir. 2020).[12]

In *Hammerling*, Google was alleged to have secretly collected personal data to learn details such as "a user's sleep schedule, menstrual cycle, or exercise routine based on when and how often they interact with an alarm clock app, fertility tracker, or fitness app." 2022 WL 2812188, at *1. The court noted that, unlike in *Facebook Internet Tracking*, the *Hammerling* plaintiffs did not allege

[11] Although *Zynga* interpreted the definition of "contents" in the federal Wiretap Act, courts recognize that "[t]he analysis for a violation of CIPA is the same as that under the Federal Wiretap Act." *E.g.*, *Brodsky v. Apple, Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020).

[12] *Facebook Internet Tracking* involved the "Like" button, not the Pixel, and the events at issue occurred in 2010 and 2011, long before the events at issue here.

that the defendant "can read the specific information (*i.e.*, content) that *a user* inputs." *Id.* at *14 (emphasis added). Notwithstanding that Google could "infer a user's traits and habits" and even "infer that the user is a female and has the ability to get pregnant," the data merely allowed it "to make 'educated guesses' about a user's traits and habits." *Id*. As a result, the court held that the plaintiffs' failed to plead that Google learned the "contents" of the communications and dismissed the CIPA claim. *Id*. at *15.

Similar to *Zynga* and *Hammerling*, Plaintiffs here do not plausibly allege that Facebook learned the "contents" of their website communications. Their allegation that Facebook intercepts a "GET request" and PageView information which "transmits the URL accessed," Compl. ¶¶ 16, 24-25, is no different than the URL information the Ninth Circuit held did not amount to a disclosure of "contents" in *Zynga*, 750 F. 3d at 1108-09. Indeed, Plaintiffs do not allege that the URL contains any "user inputs," as opposed to merely the address of a page a user visited. Thus, their CIPA claim fails consistent with *Zynga* and *Hammerling*. *See also Yoon v. Lululemon USA, Inc.*, 549 F. Supp. 3d 1073, 1082 (C.D. Cal. 2021) (CIPA "protects only the internal, *user-generated* material of a message, not routine identifiers, whether automatically generated or not.") (emphasis added).

As to "ButtonClick" and "Microdata" information, Plaintiffs' allegations are too vague, conclusory, and nonspecific. Compl. ¶ 27. They offer no insight into what additional information they are alleging the Pixel collects—beyond the PageView information, which is insufficient—that potentially could amount to the "contents" of a communication Plaintiffs had with Quest's websites. *See Yoon*, 549 F. Supp. 3d at 1077, 1082-83 (holding that "keystrokes and clicks; pages viewed; shipping and billing information; date, time, and duration of visit; IP address and physical location; and browser type and operating system" are not message "content" within meaning of CIPA).

As to Plaintiffs' allegations concerning what certain cookies allegedly collect for the three distinct categories of website users, Compl. ¶¶ 30-34, Plaintiffs do not allege that any of the information collected by these cookies—such as a user's Facebook ID or a browser identifier—was part of any communication between Plaintiffs and Quest (as opposed to a communication between Plaintiffs and Facebook, which Facebook could not "intercept" as a matter of law).

Additionally, due to their failure to allege any facts about their own Facebook status, it is not even clear what "content" of *their* communications Plaintiffs are alleging was intercepted.

**C. Plaintiffs' CIPA Claim is Preempted by Federal Law**

Plaintiffs' CIPA claim relies entirely on the allegation that Quest aided Facebook in intercepting Plaintiffs' electronic communications. Compl. ¶ 58. This claim is preempted by the federal Wiretap Act.

"Federal law [expressly] preempts state law where Congress' intent to preempt is explicitly stated in the statute's language." *Lopez v. Wash. Mut. Bank, FA*, 302 F. 3d 900, 906 (9th Cir. 2002) (quote omitted). Additionally, "[c]onflict preemption … occurs where there is an actual conflict between state and federal law" such that "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *McClellan v. I-Flow Corp.*, 776 F. 3d 1035, 1039 (9th Cir. 2015) (quotes omitted).

Plaintiffs' CIPA claim is expressly preempted because the Wiretap Act provides that "[t]he remedies and sanctions described in this chapter with respect to the *interception of electronic communications* are the *only judicial remedies* and sanctions for nonconstitutional violations of this chapter involving such communications." 18 U.S.C. § 2518(10)(c) (emphasis added). That provision works an "express preemption" of state-law claims based on the alleged interception of electronic communications. *See Bunnell v. Motion Picture Ass'n of Am.*, 567 F. Supp. 2d 1148, 1154-55 (C.D. Cal. 2007); *see also Quon v. Arch Wireless Operating Co., Inc.*, 445 F. Supp. 2d 1116, 1138 (C.D. Cal. 2006), *aff'd in part, rev'd in part on other grounds*, 529 F. 3d 892 (9th Cir. 2008).

The Wiretap Act also impliedly preempts Plaintiffs' CIPA claim because it "leaves no room in which the states may further regulate." *In re Google Inc. Street View Elec. Commc'ns Litig.*, 794 F. Supp. 2d 1067, 1084-85 (N.D. Cal. 2011). The Wiretap Act was enacted "to provide legal certainty to users and developers of innovative communications technologies with bright line rules for liability," thereby striking "a balance" between privacy interests and the ability to access and enjoy new technology. *Id.* at 1085. "State regulation acting in addition to the [Wiretap Act] might serve to obscure the legislative scheme … that Congress intended to clarify" and therefore upset that "fragile balance considered by Congress." *Id.*; *see also Bunnell*, 567 F. Supp. 2d at 1154 (noting

the "comprehensive" nature of the federal scheme that "regulates private parties' conduct, law enforcement conduct, outlines a scheme covering both types of conduct and also includes a private right of action," leaving "no room" for state regulation).

There is contrary authority on both express and implied preemption. Some courts have held that "the plain language of § 2518(10)(c) simply states that a violation of the chapter has limited remedies and sanctions," which "does not mean that violations of *other* laws (such as CIPA) cannot provide for *other* remedies and sanctions." *Shively v. Carrier IQ, Inc.*, 2012 WL 3026553, at *3 (N.D. Cal. 2012). Respectfully, that reading renders Section 2518(10)(c) meaningless. Because Congress specifically delineated the sanctions and remedies that result from a violation of the Wiretap Act, *see* 18 U.S.C. §§ 2511(4), 2520(b), there was no need to add a provision making the obvious point that no additional relief and sanctions are available for a claim *under that very statute*.

Some courts also have rejected implied preemption, reasoning that the Wiretap Act was "an attempt to establish minimum standards" rather than to occupy the field. *See Leong v. Carrier IQ Inc.*, 2012 WL 1463313, at *3 (C.D. Cal. Apr. 27, 2012); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011). That analysis, however, ignores both the comprehensive nature of the Wiretap Act and its objective of providing certainty when striking a balance between privacy rights and free access to communications technologies.

### D. Plaintiffs' CMIA Claim Fails Because None of the Information Allegedly Disclosed or Used Constitutes "Medical Information"

CMIA defines "medical information" as "individually identifiable information … in possession of or derived from a provider of health care … regarding a patient's medical history, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). "Individually identifiable," in turn, "means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual." *Id.* The information Plaintiffs allege that Facebook intercepted does not qualify as "medical information" because it does not reveal any substantive information regarding a website visitor's medical history, condition, or treatment. *See id.* Moreover, Plaintiffs do not allege that any of *their* individually identifiable information was disclosed or used.

In *Eisenhower Medical Center v. Superior Court*, the California Court of Appeal explained that "medical information" under CMIA "is *substantive information* regarding a patient's medical condition or history that is *combined with* individually identifiable information." 226 Cal. App. 4th 430, 434 (Cal. Ct. App., 4th Dist. 2014) (emphases added). In *Eisenhower*, patient data was stolen from a medical center, including names, medical record numbers, birthdates, and last four digits of Social Security Numbers. *Id.* at 432. Although the information disclosed was individually identifiable, the court held that it was not "medical information" because it "does not reveal medical history, diagnosis, or care." *Id.* at 435. Critically, the court found that "[c]onfirmation that a person's medical record exists somewhere is not medical information as defined under the CMIA," nor is "the mere fact that a person may have been a patient." *Id.* at 435-36. Similarly, in *Wilson v. Rater8, LLC*, 2021 WL 4865930, at *1, *5 (S.D. Cal. Oct. 18, 2021), the court found that "treating physician names, medical treatment appointment information, and medical treatment discharge dates and times" did not constitute "medical information" under CMIA even though some of it was personally identifiable.

As in *Eisenhower* and *Wilson*, Plaintiffs here do not identify any disclosure of "substantive information" regarding their medical history, condition, or treatment. Plaintiffs allege that when visitors access MyQuest, the Pixel "intercept[s] and transmit[s] PageView information" and "transmits the URL accessed." Compl. ¶¶ 24-25. But Plaintiffs do not allege that any *substantive* information—such as what test a visitor took or what the results were—was disclosed in the URL itself or otherwise.[13] Even assuming "the URL of the webpage a patient accessed to review test results" was disclosed, *id.* ¶ 67, it is not materially different than information disclosed in *Eisenhower*, which revealed that the person was a patient and that a "medical record exists somewhere." *Eisenhower*, 226 Cal. App. 4th at 435-36. And it is far less revealing than the detailed

[13] Plaintiff's CMIA claim relates to accessing MyQuest in that they complain about disclosure of "the URL of the webpage a patient accessed to review test results." Compl. ¶ 67. The only potentially relevant URL identified in the Complaint is in Figure 6, which contains the words "myquest.questdiagnostics.com/results/" followed by an indecipherable string of letters, numbers, and symbols. The word "results" plainly is not "medical information" and Plaintiffs do not claim that the string of letters, numbers, and symbols reveals medical information either. The other URL in Figure 5 is a URL from the General Website that is not alleged to reveal "medical information" within the meaning of CMIA.

information disclosed in *Wilson*, which the court held was not medical information under CMIA. *Wilson*, 2021 WL 4865930, at *5. *See also Smith,* 262 F. Supp. 3d at 955 ("Nothing about the URLs, or the content of the pages located at those URLs, relates 'to the past, present, or future physical or mental health or condition of an individual'"); *Jackson v. Jamaica Hosp. Med. Ctr.*, 61 A.D.3d 1166 (N.Y. Sup. Ct. App. Div. 2009) (disclosure of information in medical records regarding when an event occurred "cannot be characterized as protected health information [under HIPAA], as it has no apparent connection to the [patient's] physical condition or medical care.").

Additionally, Plaintiffs do not plausibly allege that any of *their* individually identifiable information was disclosed.[14] Plaintiffs' theory is that "a patient's Facebook ID and other Facebook identifiers" are personal identifying information. Compl. ¶ 67. But, as noted, Plaintiffs do not allege whether *they* have a Facebook ID or other Facebook identifiers, as they did not plead any facts whatsoever about their Facebook status. To the extent Plaintiffs fall within the category of visitors who do not use Facebook, the only information allegedly disclosed is a value that "identifies the browser." *Id.* ¶ 34. But it is well settled that browser identifiers alone are not sufficient to identify a person. *In re Hulu Privacy Litig.*, 2014 WL 1724344, at *11 (N.D. Cal. Apr. 28, 2014) ("a unique anonymized ID alone is not [personally identifiable information]"); *Eichenberger v. ESPN, Inc.*, 2015 WL 7252985, at *5 (W.D. Wash. May 7, 2015) ("device serial number" is not personally identifiable information); *see also In re Nickelodeon Consumer Privacy Litig.*, 827 F. 3d 262, 285-86 (3d Cir. 2016) ("static digital identifiers" are not "personally identifiable information"); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) (browser identity does not itself identify a particular person; "it identifies a specific device, and nothing more.").

**E. Plaintiffs' CMIA claim fails because they do not allege that Quest was the party that disclosed or used the information at issue.**

Plaintiffs are claiming that *Facebook* intercepted the information at issue, and that Quest aided and abetted Facebook by installing the Pixel on Quest's websites. Compl. ¶¶ 16-17. Although

[14] Plaintiffs allege that Quest removed the Pixel from MyQuest "sometime after December 2021." Plaintiff Roche's visit to MyQuest allegedly occurred in March 2022. It is thus unclear whether Roche is alleging that any of her individually identifiable information was disclosed. Compl. ¶¶ 5, 23 n.21.

CIPA's specific language has led the Ninth Circuit to conclude that it creates an aiding and abetting claim, CMIA does not contain similar language. By its plain terms, CMIA only prohibits a *health care provider* from improperly disclosing or using medical information. Cal. Civ. Code § 56.10(a) ("A provider of health care…shall not disclose….); Cal. Civ. Code § 56.10(d) (provider of health care shall not "share" or "sell" medical information or "use [it] for marketing"). "Disclose" means "an affirmative act of communication." *Regents of Univ. of Cal. v. Superior Court*, 220 Cal. App. 4th 549, 564 (Cal. Ct. App. 2013). Indeed, to state a CMIA claim the "plaintiff must plead an 'affirmative communicative act' *by the defendant.*" *Stasi v. Inmediata Health Grp.*, 501 F. Supp. 3d 898, 922 (S.D. Cal. 2020) (emphasis added).

In support of their CMIA claim, Plaintiffs allege that "Defendant's Pixel disclosed medical information," Compl. ¶ 67, but the Court need not accept this conclusory allegation, especially since it is inconsistent with Plaintiffs' other allegations. Indeed, the only Pixel that Plaintiffs identify belongs to Facebook, not Quest. *Id.* ¶¶ 16-17. Moreover, as noted above, Plaintiffs' theory is that "a patient's Facebook ID and other Facebook identifiers" are personal identifying information. *Id.* ¶ 67. But Plaintiffs do not allege any facts suggesting that Quest ever disclosed or used (much less received) a patient's Facebook ID or other Facebook identifiers. Because Plaintiffs plainly are not challenging any improper disclosure or use *by Quest* their CMIA claim fails as a matter of law.

## V. CONCLUSION

For the foregoing reasons, Defendant Quest Diagnostics Incorporated respectfully requests that the Court dismiss the Complaint.

Dated: November 22, 2022

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Zoë K. Wilhelm*

Zoë K. Wilhelm
Matthew J. Fedor (admitted *pro hac vice*)
Joie C. Hand

***Attorneys for Defendant***
***Quest Diagnostics Incorporated***