**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

Alexander E. Wolf (State Bar No. 299775)
John J. Nelson (State Bar No. 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
401 W. Broadway
Suite 1760
San Diego, CA 92101
Tel: 858-209-6941
Email: awolf@milberg.com
jnelson@milberg.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANGELA COLE and BEATRICE ROCHE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS, INC.,<br><br>Defendant. | Case No. 1:22-cv-00892-JLT-SKO<br><br>**OPPOSITION TO MOTION TO DISMISS**<br><br>Hon. Jennifer L. Thurston<br>Courtroom 4–7th Floor |

**TABLE OF CONTENTS**

**PAGE(S)**


I. INTRODUCTION ........ 1

II. ARGUMENT ........ 3

A. Defendant Fails to Establish that it Received Plaintiffs' Consent to Assist Facebook with Intercepting Their Communications ........ 3

B. Plaintiffs Adequately Allege that Defendant Assisted Facebook with Intercepting the "Contents" of Their Communications ........ 8

C. Plaintiffs' CIPA Claim is Not Preempted by Federal Law ........ 11

D. Plaintiffs Adequately Allege that Defendant Disclosed Protected Medical Information ........ 13

E. Plaintiffs Adequately Allege that Defendant is the Disclosing Party ........ 17

III. ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND ........ 19

IV. CONCLUSION ........ 19

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Almaznai v. S-L Distrib. Co., LLC*,
2021 WL 4457025 (N.D. Cal. June 21, 2021) .......... 4

*Belozerov v. Gannett Co., Inc.*,
2022 WL 17832185 (D. Mass. Dec. 20, 2022) .......... 18

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) .......... 3, 5

*Bunnell v. MPAA*,
567 F. Supp. 2d 1148 (C.D. Cal. 2007) .......... 13

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 3

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) .......... 6

*Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*,
132 Cal. App. 4th 1466 (2005) .......... 8

*Czarnionka v. Epoch Times Ass'n, Inc.*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) .......... 18

*DeSoto v. Yellow Freight Sys.*,
957 F.2d 655 (9th Cir. 1992) .......... 19

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 4

*Eisenhower Med. Ctr. v. Superior Ct.*,
226 Cal. App. 4th 430 (2014) .......... 14, 15, 16

*Hammerling v. Google LLC*,
2022 WL 2812188 (N.D. Cal. July 18, 2022) .......... 10, 11

*Holomaxx Techs. v. Microsoft Corp.*,
783 F. Supp. 2d 1097 (N.D. Cal. 2011) .......... 4

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) .......... 10, 14, 15

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 3

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F.3d 125 (3d Cir. 2015) .......... 8, 9

*In re Google Inc. St. View Elec. Commc'ns Litig.*,
794 F. Supp. 2d 1067 (N.D. Cal. 2011) .......... 11, 13

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 3

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) .......... 9

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... 5

*In re Meta Pixel Healthcare Litig.*,
2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) .......... passim

*In re NSA Telecommunications Records Litig.*,
483 F. Supp. 2d 934 (N.D. Cal. 2007) .......... 11

*In re Vizio, Inc. Consumer Priv. Litig.*,
2017 WL 11420284 (C.D. Cal. July 25, 2017) .......... 9

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) .......... 8

*Katz-Lacabe v. Oracle America, Inc.*,
2023 WL 2838118 (N.D. Cal. Apr. 6, 2023) .......... 10

*Kearney v. Salomon Smith Barney, Inc.*,
39 Cal. 4th 95 (2006) .......... 12

*Klein v. Hughes*,
2009 WL 10672144 (C.D. Cal. Dec. 15, 2009) .......... 13

*Leong v. Carrier IQ Inc.*,
2012 WL 1463313 (C.D. Cal. Apr. 27, 2012) .......... 11, 12, 13

*People ex rel. Harris v. Pac Anchor Transp. Inc.,*
59 Cal. 4th 772 (2014) .......... 11

*People v. Conklin,*
12 Cal. 3d 259 (1974) .......... 12

*Regents of Univ. of Cal. v. Superior Court*,
220 Cal. App. 4th 549 (2013) .......... 17

*Risher v. Adecco Inc.*,
2020 WL 13505422 (N.D. Cal. Feb. 14, 2020) .......... 3

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) ........................................ 5

*Ryabyshchuk v. Citibank (S. Dakota) N.A.*,
2011 WL 5976239 (S.D. Cal. Nov. 28, 2011) ........................................ 3

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) ........................................ 19

*Shively v. Carrier IQ, Inc.*,
2012 WL 3026553 (N.D. Cal. July 24, 2012) ........................................ 11, 12

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ........................................ 5

*Spy Optic, Inc. v. Alibaba.com, Inc.*,
163 F. Supp. 3d 755 (C.D. Cal. 2015) ........................................ 4

*Stasi v. Inmediata Health Grp. Corp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ........................................ 17

*Tamraz v. Bakotic Pathology Assocs., LLC*,
2022 WL 16985001 (S.D. Cal. Nov. 16, 2022) ........................................ 15, 16

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) ........................................ 11, 12

*Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc.*,
41 Cal. 4th 929 (2007) ........................................ 12

**STATUTES**

18 U.S.C. § 2518(10)(c) ........................................ 11

Cal. Civ. Code § 56.05(i) ........................................ 13

Cal. Civ. Code § 56.10(a) ........................................ 13, 17

Cal. Civ. Code § 56.10(d) ........................................ 17

Cal. Civ. Code § 56.11 ........................................ 8

Cal. Pen. Code § 631 ........................................ 8, 12

**OTHER AUTHORITIES**

S. Rep. No. 1097 ........................................ 12

## I. INTRODUCTION

Angela Cole and Beatrice Roche, two residents of California, bring this action against Quest Diagnostics, Inc., their healthcare provider. In August 2019 and March 2022, Ms. Cole and Ms. Roche respectively ordered diagnostic tests from Defendant through their primary care physicians. When they received the results for those tests, they accessed Defendant's main page, www.questdiagnostics.com (the "General Website"), and they navigated to a page with a secure portal, www.myquest.questdiagnostics.com (the "Patient-Protected Website"), where they logged in, reviewed their confidential results, and logged out. Unbeknownst to Plaintiffs, throughout that process—from the moment they accessed Defendant's main page to the moment they opened their results—someone was looking over their shoulders, quietly learning what content they requested, which webpages they viewed, and which buttons they clicked: Meta Platforms, Inc., also known as Facebook, the world's largest social media website.

This occurred by design, not by accident, because Defendant installed the "Facebook Tracking Pixel" on its website and programmed it to quietly listen in on patients' communications with Defendant. The Facebook Tracking Pixel is a piece of code that advertisers, like Defendant, can integrate into their websites by incorporating it in their website's source code. When a person visits a website that contains the Pixel, the Pixel tracks their actions across the website and transmits the information—including the user's private communications (HTTP Requests), personal identifying information, and information about their past, present, or future medical conditions and/or treatment—to Facebook's servers. The information Facebook receives is transmitted alongside the website visitor's "c_userID" (i.e., Facebook ID) which associates and links that information to the visitor's Facebook profile. Facebook then compiles this information into generalized datasets, allowing Defendant to run advertisements that target users who viewed particular content.

Importantly, this would not have happened but for Defendant's decision to install the Pixel. Although the Pixel is automatically configured to collect certain data, advertisers, like Defendant, can instruct the Pixel to capture more specific pieces of information, and Defendant also determines how its website visitors' communications are categorized. Ms. Cole and Ms. Roche therefore allege

that, by placing this tracking tool on the General Website and Patient-Protected Website, Defendant knowingly disclosed their medical information to Facebook and intentionally assisted the social media giant with intercepting their communications.

Defendant has no compelling defense. Defendant first asserts that Plaintiffs consented to the wiretap, but to the contrary, Defendant expressly warranted to patients that it would not share event data that was linked to personally identifiable information. Moreover, Defendant's statement is inaccurate because website visitors' IP addresses and Facebook IDs were transmitted alongside event data (PageView, Microdata, SubscribeButtonClicks, etc.). Defendant then argues that it never helped Facebook intercept the "content" of Plaintiffs' communications, but by electing to embed the Pixel onto its website, configuring the parameters of the Pixel, disclosing full-string URLs containing patient information, and related microdata, Defendant did exactly that.

Defendant next contends that the federal Wiretap Act preempts California's wiretap statute, but that position has been almost uniformly rejected by courts that have considered it.

Defendant then turns to Plaintiffs' claims under the Confidentiality of Medical Information Act, arguing that Plaintiffs fail to allege that it disclosed medical information. That argument, however, ignores the fact that: (1) test information fits neatly within the CMIA's definition of medical information; and (2) the data Facebook received was not limited to URLs but also included microdata that reveals additional information about the website visitor's communications. For example, the phrase "hepatitis positive test result" may not appear in the URL of a particular webpage, but the webpage's microdata may nonetheless reveal the visitor's medical condition because microdata includes the text, titles, headers, images, image captions, links, and other information located on the webpage, and this is true regardless of whether that information appears in the URL. Defendant ends by asserting that it cannot constitute the disclosing party, but by integrating the Pixel into its websites and causing information to be transmitted, Defendant engaged in an affirmative communicative act that resulted in the information being disclosed. Moreover, the disclosures in question are not limited to data transmission sent via the website visitors' browsers but also include server-to-server data transmissions wherein Defendant's server

sent information about its website visitors communications directly to Facebook's server. As a result, Defendant's Motion to Dismiss must be denied in full.

## II. ARGUMENT

### A. Defendant Fails to Establish that it Received Plaintiffs' Consent to Assist Facebook with Intercepting Their Communications

Defendant first argues that "Plaintiffs have failed to plausibly allege facts suggesting they did not consent to or authorize the collection of information about their visits to Quest's website by the Facebook Pixel." ECF No. 34 ("MTD") at 12:16-17. As an initial matter, it is Defendant's burden, not Plaintiffs', to establish consent. *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020) ("As the party seeking the benefit of an exception, Defendants have the burden to establish the existence of consent."). And Defendant has failed to carry that burden, declining to address its repeated representations to patients that it would refrain from sharing event data paired with direct identifiers.[1]

"Consent to an interception can be explicit or implied, but any consent must be actual." *In re Google Inc.*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). "In order for consent to be actual, the disclosures must explicitly notify users of the practice at issue." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D. Cal. 2021) (internal quotations omitted). Moreover, "consent is not an all-or-nothing proposition," *see Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 623 (N.D. Cal. 2021) (internal quotations omitted), and so "a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interceptions exceeded those boundaries." *See Brown*, 525 F. Supp. 3d at 1067 (internal quotations omitted). "The disclosures must have only one plausible interpretation for a finding of consent." *Calhoun*, 526 F. Supp. 3d at 620.

[1] Also as an initial matter, because consent is an affirmative defense it is not properly raised in a motion to dismiss. *Risher v. Adecco Inc.*, 2020 WL 13505422, at *3 (N.D. Cal. Feb. 14, 2020) ("[I]t is not incumbent on plaintiff to plead facts refuting any possible affirmative defense, and resolution of the scope of any consent must await development of the record.");*Ryabyshchuk v. Citibank (S. Dakota) N.A.*, 2011 WL 5976239, at *5 (S.D. Cal. Nov. 28, 2011) ("[A] motion for summary judgment—rather than a motion to dismiss—is the proper place for the creditor to establish that the consumer's claim fails due to the presence of prior express consent.").

Defendant uses four types of cookies: "strictly necessary cookies," "performance cookies," "functional cookies," and "targeting cookies." *See* Ex. D.[2] Defendant's Pixel, which Defendant integrated into its General Website and Patient-Protected Website, intercepts website visitors' communications alongside "performance" or "targeting" cookies. *Compare* ECF No. 23 ("FAC") ¶ 14 ("Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.") *with* Ex. D (explaining performance cookies "collect information about how visitors use a website, such as the number of visitors browsing the site or a particular section of the site") *and id.* (explaining that targeting cookies "are used to deliver online advertisements both on and off websites visited that may be more relevant to visitor interests based on the activity from a website being browsed"). For both types of cookies, Defendant explicitly disclaims sharing event data that is associated with direct identifiers. *See id.* (stating that performance cookies only collect "aggregated and therefore anonymous" information, not "information that identifies a specific user"); *id.* (stating that targeting cookies "do not directly store personal information," only information identifying "a particular visitor's browser and/or device"); FAC ¶ 41 (same).

Notwithstanding these disclaimers, Defendant used the Pixel "to ***link to Facebook IDs and corresponding Facebook profiles***," and thereby sought to "pair event data with personally identifiable information so it [could] later ***retarget patients*** on Facebook." *See* FAC ¶¶ 39-40 (emphasis added); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("A

---

[2] Plaintiffs do not object to incorporation by reference of Exhibit D attached to the Hausmann Decl. (ECF 34-2). Exhibit D is quoted in at FAC ¶ 41. Plaintiffs object to the remainder of the Hausmann Decl. in its entirety, including Exhibits A, B, and C (Quest's various Privacy Policies), and the Rigal Decl. in its entirety (ECF 34-1). These exhibits and accompanying narrative are not quoted in the FAC and are not relied upon by Plaintiffs, and therefore cannot be considered under the incorporation by reference or judicial notice doctrines. *E.g.*, *Almaznai v. S-L Distrib. Co., LLC*, Case No. 20-cv-08487-JST, 2021 WL 4457025, at *3-4 (N.D. Cal. June 21, 2021) (refusing to consumer agreement not attached to complaint because "under *Khoja*, the Court may consider the Agreement of Sale under the incorporation-by-reference doctrine only if [the plaintiff's] claims necessarily depend on it."); *Holomaxx Techs. v. Microsoft Corp.*, 783 F. Supp. 2d 1097 (N.D. Cal. 2011) (declining to consider provider's website service agreement because, even though complaint referenced terms of service agreement, reference was insufficient to trigger incorporation by reference doctrine); *see also Spy Optic, Inc. v. Alibaba.com, Inc.*, 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015) ("[P]rivate corporate websites, particularly when describing their own business, generally are not the sorts of sources whose accuracy cannot reasonably be questioned").

Facebook link or an email address may well readily enable an ordinary person to identify an individual."); *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID … personally identifies a Facebook user."); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("A Facebook ID, as the *Hulu* court found, is thus equivalent to a name—it stands in for a specific person, unlike a device identifier."). Thus, by acting contrary to its express representations, Defendant foreclosed any argument that it received consent for the alleged conduct. *See Brown*, 525 F. Supp. 3d at 1063 ("Google cannot demonstrate that Plaintiffs expressly consented because Google did not notify users that it would be engaging in the alleged data collection while Plaintiffs were in private browsing mode."); *In re Meta Pixel Healthcare Litig.*, --- F. Supp. ---, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) ("I am skeptical that a reasonable user who viewed Meta's policies would have understood that Meta was collecting protected health information.").

Defendant analogizes to *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017), but that reliance is misplaced. Defendant first asserts that *Smith* stands for the unremarkable proposition that, if written appropriately, a privacy policy can establish consent. *See* MTD at 14 (analogizing to the Cookie Policy but declining to quote any specific language that Defendant thought was analogous). But as previously explained, "the disclosures must explicitly notify users of the practice at issue," *see Brown*, 525 F. Supp. 3d at 1063, and here, Defendant's Cookie Policy does the opposite—i.e., reassuring patients that Defendant only uses tracking tools that collect aggregated, anonymous information. FAC ¶ 41 ("Quest Diagnostics expressly warrants that it will never conspire with a third[] party to intercept usage data paired with personally identifiable information.").

Defendant then attempts to excuse its own privacy violations by hiding behind the policies of the third-party app developer, Facebook. Specifically, Defendant argues *Smith* supports the notion that, by agreeing to Facebook's Terms of Service, "Plaintiffs expressly consented to Facebook collecting their browsing activity and other data." *See* MTD at 15. But again, Defendant's specific representations cannot be superseded by any purported agreement with Facebook, especially not one

which only generally contemplates that Facebook might sometimes collect information about the actions they take on the internet. *See Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014) ("[A]ny consent with respect to the processing and sending of messages itself does not necessarily constitute consent to the specific practice alleged in this case—that is, the scanning of message content for use in targeted advertising."). To hold otherwise would lead to absurdity, allowing Defendant to post a cookie policy that says, "Quest Diagnostics does not—and never will—use the Meta Pixel," and still shield itself from liability by referencing the general terms to which Facebook users agree when creating an account.

Even if Defendant somehow succeeds in arguing consent for the General Website, that argument must fail for users of the Patient-Protected Website because Defendant assisted Facebook with intercepting protected health information. As discussed later, the CMIA protects the health information at issue. *See infra* Section D. And so does HIPAA, which "defines 'protected health information' as 'individually identifiable' information that is 'created or received by a healthcare provider' (or similar entities) that '[r]elates to the past, present, or future physical or mental health or condition of an individual' or the 'provision of health care to an individual.'" *See In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *8 (quoting 45 C.F.R. § 160.103). Of note, in response to the use of Pixel tracking by HIPAA-covered entities, the HHS recently-issued a Bulletin reminding website owners that use of these tools can result in impermissible disclosures:

> The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.
>
> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional

> harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.

*Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited April 5, 2023) (emphasis in original).

As Judge Orrick recently explained, "the URLs and other information transmitted through the Pixel establish that a user is about to log in to a healthcare provider's website," and so "the Pixel captures information that connects a particular user to a particular healthcare provider—*i.e.*, patient status—which falls within the ambit of information protected under HIPAA." *See In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *9. Critically, Judge Orrick carefully reviewed Facebook's Terms of Service and concluded that "Meta's policies do not, however, specifically indicate that Meta may acquire health data obtained from Facebook users' interactions with their medical providers' websites." *Id.* "Its generalized notice is ***not sufficient to establish consent***." *Id.* (emphasis added); *see also Rickwalder v. Meta Platforms, Inc.*, 21-cv-383-3231, at 26 (Cal. Sup. Ct. Sept. 15, 2022) ("In sum, Facebook does not show that Plaintiffs—specifically, Ms. McDaniel—consented to HBO's disclosure of personally identifiable information to Facebook in violation of the VPPA.") (attached as exhibit A).

Here, too, Meta's alleged disclosures are insufficient to establish consent. And the instant transmissions go a step further, establishing that Plaintiffs successfully logged into the Patient-

Protected Website and accessed test results for specific conditions. *See, e.g.*, FAC ¶ 68 (alleging Defendant "disclosed the URL of the webpage a patient accessed to review test results"). By declining to even suggest that it obtained HIPAA-compliant consent, Defendant effectively concedes that it never received Plaintiffs' consent to share protected health information from the Patient-Protected Website.[3]

**B. Plaintiffs Adequately Allege that Defendant Assisted Facebook with Intercepting the "Contents" of Their Communications**

Defendant contends that Plaintiffs' wiretapping claims fail "because they did not … plausibly allege that Facebook learned the 'contents' of any of Plaintiffs' internet communications with Quest's website." *See* MTD at 15:24-25. But that argument ignores that full-string URLs described in the FAC—the information Plaintiffs allege Defendant helped Facebook learn—contain user-entered and user-specific information that constitutes content, particularly when coupled with microdata that includes the text, titles, headers, images, image captions, links, and other information located on the webpage.

CIPA prohibits any person or entity from "aid[ing], agree[ing] with, employ[ing], or conspir[ing]" with a third party to "learn the contents or meaning" of a "communication" without consent. *See* Cal. Pen. Code § 631(a). "[T]he term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). Record information and content, however, "are not mutually exclusive categories." *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125, 139 (3d Cir. 2015). "For instance, contact information provided as part of a sign-up process constitutes 'content' because this information is the subject of the communication." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11.

[3] The CMIA imposes even more strenuous consent requirements pursuant to Cal. Civ. Code § 56.11 (requiring handwritten or typewritten authorization of at least 14-point type, authorization provision must be separate form any other language on the same page, executed by a standalone signature, and enumerates all specific uses and limitations). Authorizations failing to satisfy these requirements are deemed invalid. *Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*, 132 Cal. App. 4th 1466, 1473 (2005). Defendant does not argue it satisfies all of these requirements.

Plaintiffs plausibly allege that Defendant assisted Facebook with learning the content of their communications. Plaintiffs allege that they accessed both the General Website and the Patient-Protected Website. *See* FAC ¶¶ 4-5. For the General Website, Defendant "transmitted PageView, Microdata, and ButtonClick data," which sent "the URL of the page requested, along with the title of the page, keywords associated with the page, and a description of the page." *See id.* ¶¶ 28-29. For the Patient-Protected Website, Defendant "transmit[t]ed PageView information," which sent "the URL accessed," allowing Facebook to know "that a patient ha[d] received and [was] accessing test results." *Id.* ¶¶ 24-26. Figures 5 and 6 exemplify the point, displaying the types of URLs that Facebook obtained. *See id.* ¶ 24.[4] As the exemplars make clear, Defendant structured the post-domain portions of the URLs—everything after ".com"—to disclose details about the webpage requested, and thus by helping Facebook learn that information, Defendant helped Facebook learn the content of Plaintiffs' communications. *See In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d at 139 ("[T]he domain name portion of the URL—everything before the '.com'—instructs a centralized web server to direct the user to a particular website, but post-domain name portions of the URL are designed to communicate to the visited website which webpage content to send the user."); *see also In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) (finding that "content categories of the site or app," along with other types of information, "fall[s] within the definition of content"); *In re Vizio, Inc. Consumer Priv. Litig.*, 2017 WL 11420284, at *6 (C.D. Cal. July 25, 2017) ("[N]othing in *In re Zynga Privacy Litigation* suggests that the standard for determining whether information qualifies as record or content data depends on how much content is collected or whether the intercepted information would be recognizable.") (internal quotations omitted).

*In re Meta Pixel Healthcare Litigation*, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) is instructive. There, "four Facebook users" brought wiretapping claims against Meta Platforms, Inc., alleging their healthcare providers "installed the Meta Pixel on their patient portals." *Id.* at

[4] For the General Website: https://www.questdiagnostics.com/healthcare-professionals/about-our-tests/allergy-asthma. For the Patient-Protected Website: https://myquest.questdiagnostics.com/results/4jkE3XHNNBR97gS1XIO_-O%3D%3D/prsId/FzMFvzrjkM4cUzKprO%3d%3D

*1. Based on these allegations, the plaintiffs sought a preliminary injunction against Meta, thereby requiring the court to evaluate whether the law and facts "clearly favor[ed]" their position. *Id.* Meta asserted that "the names of buttons clicked on websites and their associated URLs are not 'content' within the meaning of the statute," *see id.* at *11, but the court "disagree[d]," observing that "the transmitted URLs include both the 'path' and 'query string,'" and holding that "[t]hese items are content because they concern the substance of a communication." *Id.* Indeed, the court specifically identified the following URL as constituting "content" under CIPA: hardfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis. *Id.* And the court found information regarding "log-in button" clicks were similarly descriptive in part because it "sufficiently identifies the website user as a patient." *Id.*, at *8, 11.

So too here. Because Defendant revealed the same type of information as the healthcare providers in *In re Meta Pixel Healthcare Litigation*, the same result should be reached. *See also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 605 (9th Cir. 2020) (finding that Facebook intercepted the content of the plaintiffs' communications by "collect[ing] a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web-server, and the name of the precise file requested"); *Katz-Lacabe v. Oracle America, Inc.*, No. 22-cv-04792-RS, 2023 WL 2838118 at *15 (N.D. Cal. Apr. 6, 2023) (holding that "referrer URLs" constitute content).

Defendant relies heavily on *Hammerling v. Google LLC*, 2022 WL 2812188 (N.D. Cal. July 18, 2022), but that case says no differently. MTD at 16-17. There, the plaintiffs argued that Google wiretapped their communications by "secretly us[ing] their Android smartphones to collect data about non-installation metrics, the amount of time spent using the non-Google apps, and how often those apps were opened." *See id.* at *1. As the court properly recognized, those allegations only amounted to generalized "usage and engagement data," *see id.*, and unlike the URLs (and related microdata and button click data) at issue here, that data failed to reveal "the specific information (i.e., content) that a user input[ted]." *Id.* at *14; *see also In re Meta Pixel Healthcare*

*Litig.*, 2022 WL 17869218, at * 16 n. 13 (observing that "the kind of data collected in *Hammerling* is not analogous to the data at issue here"). *Hammerling* is therefore inapposite.

**C. Plaintiffs' CIPA Claim is Not Preempted by Federal Law**

***Express Preemption.*** "Express preemption exists where Congress enacts an explicit statutory command that state law be displaced." *Leong v. Carrier IQ Inc.*, No. CV 12-01562 GAF MRWX, 2012 WL 1463313, at *2 (C.D. Cal. Apr. 27, 2012). Defendant argues that the Wiretap Act (ECPA) expressly preempts CIPA and asks the Court to endorse wholesale invalidation of California law. But no such provision is found in the Act. On the contrary, "Congress expressly authorized states to legislate in this field." *Id.*, at *4.

To be sure, the purported express preemption provision cited by Defendant, 18 U.S.C. § 2518(10)(c), has been thoroughly examined by courts across California. MTD at 18. Citing legislative history, the majority of courts agree that 18 U.S.C. § 2518(10)(c) merely clarifies that, in criminal cases, evidence suppression is not a remedy for a Wiretap Act violation without an underlying Fourth Amendment violation. *Leong*, 2012 WL 1463313, at *4 ("that provision does not even impact the question of preemption, but rather focuses on the scope of available federal remedies when a violation of the statute has been established"); *In re NSA Telecommunications Records Litig.*, 483 F. Supp. 2d 934, 939 (N.D. Cal. 2007); *Shively v. Carrier IQ, Inc.*, No. C-11-774 EMC, 2012 WL 3026553, at *3-5 (N.D. Cal. July 24, 2012); *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1029 (N.D. Cal. 2011).[5] This reading is consistent with the Wiretap Act's purpose and respectfully does not, as Defendant suggests, render 2518(10)(c) "meaningless." MTD at 19:8.

***Implied Preemption.*** Implied and conflict preemption analysis begins with presumption that the traditional police powers of states are not displaced by federal law unless that was the "clear and manifest purpose of Congress." *People ex rel. Harris v. Pac Anchor Transp. Inc.,* 59

[5] The case Defendant cites as holding CIPA impliedly preempted also declined to find CIPA expressly preempted. *In re Google Inc. St. View Elec. Commc'ns Litig.*, 794 F. Supp. 2d 1067, 1085 n.12 (N.D. Cal. 2011) (rejecting Quest's "interpretation of Section 2518(10)(c) as an express preemption clause" because it "misinterprets the provision.").

Cal. 4th 772, 778 (2014). The presumption against preemption applies with particular force here because the protection of citizens' informational privacy interests is a traditional police power of the states. *See People v. Conklin,* 12 Cal. 3d 259, 265 (1974) ("[CIPA Section 631] is an exercise of the 'historic police powers of the States'"); *Shively*, 2012 WL 3026553, at *9. "[C]ourts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." *Viva! Int'l Voice for Animals v. Adidas Promotional Retail Operations, Inc*., 41 Cal. 4th 929, 936 (2007).

Applying this rigorous standard, a significant majority of cases, including multiple California Supreme Court decisions, have found that the Wiretap Act does not preempt CIPA because Congress did not intend for the Wiretap Act to occupy the field, but merely to establish minimum standards that would leave states free to enact more protective laws. For example, in *Conklin*, the California Supreme Court held that the Wiretap Act did not preempt application of CIPA Section 631 based on field or conflict preemption. 12 Cal. 3d at 269, 272-73. The court found that Congress did not intend for the Wiretap Act to preempt the field of wiretapping because the Senate Judiciary Committee report on the Act (S. Rep. No. 1097 (1968)) referred to "numerous areas touching upon the field of electronic surveillance which state law may control," thereby indicating that Congress "anticipated state regulation of electronic surveillance." *Id.* The court also found that CIPA Section 631's all-party consent rule, while more protective than the Wiretap Act's single-party consent rule, did not interfere with federal objectives because "Congress intended that the states be allowed to enact more restrictive laws designed to protect the right of privacy." *Id.* at 271.

In years following, state and federal courts alike have repeatedly adopted this reasoning and declined to find CIPA preempted. *Kearney v. Salomon Smith Barney, Inc*., 39 Cal. 4th 95, 105 (2006) (Wiretap Act does not preclude states from adopting laws more protective of privacy); *Shively*, 2012 WL 3026553, at *8 (finding against implied field preemption based on ECPA's legislative history and because complete preemption is a rarity that "arises only in extraordinary situations"); *Leong*, 2012 WL 1463313, at *3-5 (same); *Valentine v. NebuAd, Inc.*, 804 F. Supp.

2d 1022, 1029 (N.D. Cal. 2011) (same); *Klein v. Hughes*, 2009 WL 10672144, at *6 (C.D. Cal. Dec. 15, 2009) (same).

Defendant relies upon two federal district court cases that found implied preemption, *Bunnell v. MPAA*, 567 F. Supp. 2d 1148 (C.D. Cal. 2007) and *In re Google Inc. Street View Elec. Comm'ns Litig*., 794 F. Supp. 2d 1067 (N.D. Cal. 2011), but subsequent cases persuasively reject their analyses. As explained in *Leong*:

> . . . the analysis in these cases ignores the ***great weight of authority*** holding that one of the principal purposes of the federal statute was to establish minimum standards with which states must comply. In that regard, *Bunnell* and *In re Google Inc. Street View* reflect a ***marked departure*** from the preemption analysis of courts in this and other districts and circuits in the ***more than four decades since the Federal Wiretap Act was enacted***. In light of the clarity of the 1968 and 1986 Senate Reports that the federal law is intended to establish minimum standards and not to preempt state laws that meet these standards; the long-standing view of the States and courts that States are free to enact legislation that is more restrictive than the federal law; and the rarity with which preemption applies, the Court concludes that the Federal Wiretap Act does not completely preempt California's Invasion of Privacy Act.

2012 WL 1463313, at *5 (emphasis added).

Against this backdrop, *Bunnell* and *Google Street View* "are, by far, in the minority." *Id.,* at *3. Accordingly, Defendant cannot meet its high burden to demonstrate preemption applies here.

**D. Plaintiffs Adequately Allege that Defendant Disclosed Protected Medical Information**

The CMIA states that a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . ." Cal. Civ. Code § 56.10(a). "'Medical information' means any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). "'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id*. California courts have

interpreted this statutory language to require disclosure of individually identifiable information that has a "substantive" medical treatment nexus (such as medical test information), meaning that the disclosure of individually identifiable information alone, unrelated to medical treatment, is insufficient. *Eisenhower Med. Ctr. v. Superior Ct.*, 226 Cal. App. 4th 430, 435 (2014) ("It is clear from the plain meaning of the statute that medical information cannot mean just any patient-related information held by a health care provider, but must be 'individually identifiable information' and also include 'a patient's medical history, mental or physical condition, or treatment.'").

Here, Defendant has unlawfully disclosed Plaintiffs' medical information to third parties (*i.e.* Facebook), in violation of the CMIA. Specifically, Plaintiffs allege in the FAC that "Defendant aids, employs, agrees with, and conspires with Facebook to eavesdrop on communications sent and received by Plaintiffs and Class members, ***including communications containing protected medical information***." FAC ¶ 3 (emphasis added). The specific medical information disclosed by Defendant to Facebook is protected medical information regarding Plaintiffs' medical tests, which Plaintiffs accessed through Defendant's Patient-Protected Website. *See* FAC ¶ 26 ("For the Patient-Protected Website, PageView discloses information 'regarding a patient's medical history, mental or physical condition, or treatment' because it transmits information showing, at a minimum, that a patient has received and is accessing test results."); ¶ 29 ("Quest Diagnostics transmitted PageView, Microdata and Button Click data so Facebook could learn the contents and meaning of a user's electronic communication.").

This unlawfully disclosed medical information also individually identified Plaintiffs. *See id.*, ¶ 30 ("Defendant's Pixels also intercept and collect personally identifiable information."); ¶ 31 ("A user who accesses either website [(*i.e.* the General Website or the Patient-Protected Website)] while logged into Facebook[6] will transmit the c_user cookie to Facebook, which contains that user's

---

[6] Both Plaintiffs allege that they typically remain logged into Facebook when accessing their accounts from Defendant, FAC ¶¶ 4-5, meaning that their unencrypted Facebook ID was transmitted to Facebook when they accessed the General Website or the Patient-Protected Website.

unencrypted Facebook ID[7].")). In short, Defendant disclosed medical information related to medical tests Plaintiffs underwent through Defendant (substantive medical information), which was individually identifiable because the information related to the medical tests was linked to Plaintiffs' Facebook IDs. *See id.*, ¶ 68 ("Defendant's Pixel disclosed medical information because it transmitted a patient's Facebook ID and other Facebook identifiers, which constitutes individually identifiable information, alongside event data that disclosed the URL of the webpage a patient accessed to review test results. By doing so, Defendant disclosed individually identifiable information regarding a patient's medical history, mental or physical condition, or treatment.").

Courts have held that a disclosure of "specimen or test information" is sufficient to meet the requirement of "substantive" medical information, as set forth in *Eisenhower*. *See, e.g., Tamraz v. Bakotic Pathology Assocs., LLC*, 2022 WL 16985001, at *5 (S.D. Cal. Nov. 16, 2022) ("Drawing reasonable inferences in favor of the non-moving party, the Court finds that 'specimen or test information' is 'medical information' under the CMIA. Therefore, Plaintiff adequately alleges the data breach included 'medical information' under the CMIA.").

Defendant argues that disclosure of the URL of the Patient-Protected Website where Plaintiffs navigated to view their test results is not "medical information." MTD at 20 n.17. However, Defendant's argument is wrong and cannot be reconciled with *Tamraz*. By disclosing URL information, such as myquest.questdiagnostics.com/results/, Defendant is disclosing to Facebook, at minimum, that Plaintiffs received and are accessing test results. FAC ¶ 26. This is undoubtedly "test information" as set forth in *Tamraz*.

Defendant continues that "even assuming 'the URL of the webpage a patient accessed to review test results' was disclosed, . . . it is not materially different than the information disclosed in *Eisenhower*[.]" MTD at 20:21-23. That is wrong. *Eisenhower* involved a stolen computer from a medical facility that contained individually identifiable data but no medical information. The

[7] Plaintiffs' Facebook IDs individually identify Plaintiffs because Facebook is a "'real identity platform,' meaning users are allowed only one account and must share 'the name they go by in everyday life.' To that end, when creating an account, users must provide their first and last name, along with their birthday and gender." FAC ¶ 10.

*Eisenhower* court explained that "[i]nformation about an individual's medical history, condition, or treatment is saved only on [the defendant's] servers located in the data center. The index that was on the stolen computer is a subset of information from its master patient index and can be used in case of a power outage or network failure to look up the patient's MRN so that a hard copy of the medical records can be located. The MRN is sequential and contains no coded information." *Eisenhower*, 226 Cal. App. 4th at 432-33. Therefore, in *Eisenhower*, there was no way that the third party could discern any medical information through the stolen computer. Here, by contrast, the information disclosed by Defendant to Facebook contains medical information in the form of "test information," as described above. The nexus of the "test information" is the exact fact that the *Tamraz* court used to distinguish that case from *Eisenhower*. The *Tamraz* court explained: "As Plaintiff points out in his Opposition, disclosure of the 'specimen or test information' in this instant case distinguishes it from the precedents cited in Defendants' briefing" (i.e. *Eisenhower*). *Tamraz*, 2022 WL 16985001, at *5.

Defendant next argues that "Plaintiffs do not plausibly allege facts indicating that any of their individually identifiable information was actually disclosed." MTD at 21. That is wrong. Plaintiffs allege that they typically remain logged into Facebook on their "devices" when accessing their accounts from Defendant, FAC ¶¶ 4-5, meaning that their unencrypted Facebook ID was transmitted to Facebook when they accessed their account through Defendant's websites. Defendant raises speculative arguments, including that Plaintiffs do not allege "whether they visited Quest's websites using the same browser or device they used to visit Facebook, or whether they cleared cookies." MTD at 21:18-19. Defendant's argument is counterfactual because Plaintiffs specifically allege that they remain logged in to Facebook on their "devices" after accessing their accounts, meaning that Plaintiffs are logged into Facebook on their internet connected devices that they also used to navigate to Defendant's websites. FAC ¶¶ 4-5. Plaintiffs also do not allege that they cleared cookies, and any supposition to the contrary by Defendant is not based in fact. In short, Plaintiffs plausibly allege that they navigated to Defendant's websites from internet connected devices that were simultaneously logged in to Facebook, which, according to the factual allegations in the FAC,

transmitted protected medical information that individually identified Plaintiffs from Defendant to Facebook, constituting a violation of the CMIA.

Finally, Defendant argues that "Plaintiffs allege that Quest removed the Pixel from MyQuest 'sometime after December 2021,' and Plaintiff Roche's visit to MyQuest allegedly occurred in March 2022. . . . These allegations suggest that Plaintiff Roche's personal identifying information was *not* shared." MTD at 22:3-6. Defendant's conclusion does not follow from the premise. March 2022 is "sometime after December 2021," so it cannot be concluded that Plaintiff Roche's information was not shared just because she visited Defendant's website in March 2022. Whether or not the Pixel was active at the time of Plaintiff Roche's visit to Defendant's website in March 2022 is ultimately a factual question to be determined through discovery.

In sum, Plaintiffs plausibly state a claim for violation of the CMIA, and Defendant's motion to dismiss Plaintiffs' CMIA claim should be denied.

**E. Plaintiffs Adequately Allege that Defendant is the Disclosing Party**

Defendant's final argument—that the FAC fails to allege facts "suggesting that Quest ever disclosed or used" medical information—rests on a misreading of the FAC and should be given short shrift. MTD at 22:26.

Section 56.10(a) prohibits a health care provider from improperly "disclosing" medical information. Cal. Civ. Code § 56.10(a). Section 56.10(d) similarly prohibits a health care provider from "sharing" or "using" such information without consent. Cal. Civ. Code § 56.10(d).[8] Plaintiffs adequately allege both disclosure and use. To be sure, while Plaintiffs contend that Defendant "aided and abetted" Facebook's unlawful interception of medical information in violation of CIPA, Plaintiffs also allege Defendant's direct participation in violation of CMIA—that is, Defendant disclosed and used medical information for marketing purposes. These legal theories are not mutually exclusive.

[8] The cases cited by Defendant hold only that the prohibitions on disclosure and sharing require an "affirmative communicative act." *See Regents of Univ. of Cal. v. Superior Court*, 220 Cal. App. 4th 549, 564 (2013); *Stasi v. Inmediata Health Grp. Corp*., 501 F. Supp. 3d 898, 922 (S.D. Cal. 2020). Section 56.10(d)'s independent prohibition on the "use [of] medical information for a purpose not necessary to provide health care services to the patient" contains no requirement of a communicative act.

As explained above, Plaintiffs allege that Defendant embedded the Pixel into its website source code. FAC ¶¶ 16, 23. The Pixel is based on open-source code created by Facebook, MTD at 22, but is also under Defendant's control by virtue of Defendant's decision to integrate the code. *Id.* ¶ 16 ("Facebook offers this piece of code to advertisers, like Quest Diagnostics, to integrate into their website."). In practice, the Pixel "tracks the people and type of actions they take." *Id.* The Pixel "surreptitiously directs the user's browser to send a separate message to Facebook's servers" containing protected information. *Id.* ¶¶ 16-17; *see also id.* ¶¶ 24 ("Defendant's Pixels intercept and transmit PageView information."), 67-68. When users "click on links . . . *Defendant* will send the URL of the page requested, along with the title of the page, keywords associated with the page, and a description of the page." *Id.* ¶ 28; *see also id.* ¶ 29 ("Quest Diagnostics transmitted PageView, Microdata and Button Click data so Facebook could learn the contents and meaning of a user's electronic communication."). Moreover, Defendant's Pixel discloses information "regarding a patient's medical history, mental or physical condition, or treatment" because it transmits information showing, at a minimum, that a patient has received and is accessing test results. *Id.* ¶ 28. Defendant's Pixel also "transmit[s] the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID"—information that personally identifies each patient by name. *Id.* ¶ 31.[9] Importantly, Facebook would not have received this information but for Defendant's decision to use the Pixel and integrate it into its source code. Unlike past Facebook Business Tools—such as the Facebook Like Button that was largely controlled and maintained by Facebook rather than third-party websites—Defendant controlled every aspect of the Pixel, was responsible for determining which of its webpages contained the Pixel, and also decided which types of information were tracked and transmitted to Facebook via the Pixel. *Id.* ¶¶ 14-17, 23-31; *see Belozerov v. Gannett Co., Inc.*, 2022 WL 17832185, (D. Mass. Dec. 20, 2022) (rejecting the argument that the defendant "did not actually 'disclose' any PII to Facebook," reasoning that the defendant "placed the tracking pixel on the USA Today website"); *Czarnionka v. Epoch Times*

---

[9] In addition to data transmission sent via the website visitors' browsers, Plaintiffs are informed and believe Defendant conducts server-to-server data transmissions wherein Defendant's server sent information about its website visitors communications directly to Facebook's server. See FAC ¶ 14.

*Ass'n, Inc.*, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022), (explaining that "Defendant's installation of the Pixel exposed its subscribers' information to Facebook," and holding that "[t]his is sufficient to constitute 'disclosure' under the VPPA").

These allegations must be accepted as true on a 12(b)(6) motion. Thus, Plaintiffs adequately allege Defendant engaged in an "affirmative communicative act" under CMIA via the Pixel—i.e., directing users' browsers to transmit Facebook IDs alongside event data regarding medical history, mental or physical condition, or treatment. *Id.* ¶ 66. And Defendant is liable for "using" this patient information for marketing purposes—a rational inference as Defendant had no reason to embed the Pixel beyond targeted advertising. *Id.* ¶ 40 (Quest uses Pixel data to "retarget patients on Facebook").

## III. ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND

If a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the Court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Indeed, leave to amend is generally improper only "where the amendment would be futile." *DeSoto v. Yellow Freight Sys.*, 957 F.2d 655, 658 (9th Cir. 1992).

Plaintiffs respectfully request that Defendants' motion be denied. Despite the low standard on a Rule 12(b)(6) motion, if the Court deems any of the claims inadequately pleaded, Plaintiffs can cure any deficiencies by further amendment. There has been no prior judicial evaluation of the pleadings and Defendant cannot demonstrate bad faith, dilatory motive, or prejudice.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied in its entirety.

Dated: April 11, 2023

**BURSOR & FISHER, P.A.**

By *__/s/ L. Timothy Fisher__*
L. Timothy Fisher

L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
E-Mail: ltfisher@bursor.com

Alexander E. Wolf (State Bar No. 299775)
John J. Nelson (State Bar No. 317598)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
401 W. Broadway
Suite 1760
San Diego, CA 92101
Tel: 858-209-6941
Email: awolf@milberg.com
jnelson@milberg.com

*Attorney for Plaintiffs*