**FAEGRE DRINKER BIDDLE & REATH LLP**
Zoë K. Wilhelm (SBN 305932)
zoe.wilhelm@faegredrinker.com
1800 Century Park East, Suite 1500
Los Angeles, California 90067
Telephone: 310-203-4000
Facsimile: 310-229-1285

Matthew J. Fedor (admitted *pro hac vice)*
matthew.fedor@faegredrinker.com
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: 973-549-7000
Facsimile: 973-360-9831

***Attorneys for Defendant***
***Quest Diagnostics Incorporated***

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

ANGELA COLE and BEATRICE ROCHE, individually and on behalf of all others similarly situated,
Plaintiffs,
v.

QUEST DIAGNOSTICS, INC.,
Defendant.

Case No. 1:22-cv-892-JLT-SKO

Hon. Jennifer L. Thuston

**DEFENDANT'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS**

## Table of Contents


Page

I. INTRODUCTION .......... 1

II. ARGUMENT .......... 1

A. Plaintiffs Have Not Plausibly Alleged Lack of Consent .......... 1

1. Lack of consent is an element of Plaintiffs' California state law claims .......... 1

2. Quest's Cookie Notice discloses the conduct Plaintiffs complain about .......... 2

3. Plaintiffs' agreement to Facebook's policies is relevant to determining whether Plaintiffs plausibly alleged lack of consent .......... 3

B. Plaintiffs have not plausibly alleged that Facebook intercepted the "contents" of any communication .......... 5

C. Plaintiffs did not plausibly allege disclosure of "medical information" .......... 8

D. Plaintiffs have not plausibly alleged that Quest was the disclosing party .......... 9

III. CONCLUSION .......... 10

# TABLE OF AUTHORITIES

**Cases** **Page(s)**


*Belozerov v. Gannett Co.*,
2022 WL 17832185 (D. Mass. Dec. 20, 2022) .......... 10

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) .......... 7, 9

*Eisenhower Medical Center v. Superior Court*,
226 Cal. App. 4th 430 (Cal. Ct. App., 4th Dist. 2 .......... 8

*Garcia v. Enter. Holdings, Inc.*,
78 F. Supp. 3d 1125 (N.D. Cal. 2015) .......... 1

*In re Google Assistant Privacy Litigation*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 1, 2

*In re Google Inc. Cookie Placement Consumer Privacy Litigation*,
806 F.3d 125 (3d Cir. 2015) .......... 7

*Heller v. Norcal Mut. Ins. Co.*,
8 Cal. 4th 30 (1994) .......... 1

*Knievel v. ESPN*,
393 F.3d 1068 (9th Cir. 2005) .......... 2

*In re Meta Pixel Healthcare Litigation*,
2022 WL 17869218 (N.D. Cal. Dec. 22, 2022) .......... 4, 5, 6, 7

*Moledina v. Marriot Int'l*,
2022 WL 16630276 (C.D. Cal. Oct. 17, 2022) .......... 1

*Sanchez v. Ritz Carlton*,
2015 WL 5009659 (C.D. Cal. Aug. 17, 2015) .......... 6

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) .......... 1

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) .......... 4

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) .......... 4

*Sutter Health v. Superior Court*,
227 Cal. App. 4th 1546 (Cal. Ct. App. 2014) .......... 9

*Tamraz v. Bakotic Pathology Associates, LLC*,
2022 WL 16985001 (S.D. Cal. Nov. 16, 2022) ........................................................ 8

*In re Zynga Privacy Litig.*,
750 F.3d 1098 (9th Cir. 2014)........................................................................... 5, 6, 7

**Statutes, Rules & Regulations**

Cal. Civ. Code § 56.05(i) ......................................................................................... 9

## I. INTRODUCTION

Plaintiffs' opposition to Quest's motion to dismiss the FAC confirms that the two small changes Plaintiffs made when they amended their complaint did not cure any of the deficiencies in their CIPA or CMIA claims. Plaintiffs have failed to state a claim upon which relief can be granted and their claims should be dismissed with prejudice.

## II. ARGUMENT

### A. Plaintiffs Have Not Plausibly Alleged Lack of Consent

#### 1. Lack of consent is an element of Plaintiffs' California state law claims

Initially, Plaintiffs' argument that consent is an affirmative defense to Plaintiffs' claims is wrong as a matter of law. As set forth in Quest's moving brief, the plain language of CIPA and CMIA make clear that a plaintiff must show lack of consent/authorization to prove a statutory violation. *See* Moving Br. at 12. Extensive case law supports this interpretation. *See, e.g., Moledina v. Marriot Int'l*, 2022 WL 16630276, at *7 (C.D. Cal. Oct. 17, 2022) ("Consent is an express element of a claim under [CIPA]"); *Garcia v. Enter. Holdings, Inc.*, 78 F. Supp. 3d 1125, 1135-36 (N.D. Cal. 2015) (rejecting argument that consent is an affirmative defense to CIPA claim and holding that "[w]here lack of consent is an express element of a claim, as is the case here, it must be alleged in the complaint."); *Heller v. Norcal Mut. Ins. Co.*, 8 Cal. 4th 30, 38 (1994) ("to violate [CMIA], a provider of health care must make an unauthorized, unexcused disclosure of privileged medical information"). Many courts have granted motions to dismiss claims for failure to plausibly allege lack of consent where it is an express element of a claim as it is here. *See, e.g., Silver v. Stripe Inc.*, 2021 WL 3191752, at *2-5 (N.D. Cal. July 28, 2021); *Garcia*, 78 F. Supp. 3d at 1137.

In support of their argument to the contrary, Plaintiffs quote from *In re Google Assistant Privacy Litigation*, 457 F. Supp. 3d 797 (N.D. Cal. 2020), *see* Opp. at 3, but that case proves Quest's point. The quoted language Plaintiffs rely on is inapplicable because it addresses consent in the context of a Stored Communications Act ("SCA") claim. *See* 457 F. Supp. 3d at 823. Critically, when the court discussed the plaintiffs' CIPA claim it recognized "whereas consent is a defense under the SCA, it appears that, under California law, the plaintiff bringing a CIPA claim has the burden to prove that the defendant lacked consent to record." *Id.* at 828. The court instructed the

plaintiffs to amend, finding that their existing "allegation that the recordings 'were made without Plaintiffs' consent' is conclusory." *Id*. Plaintiffs' conclusory allegations about the purported lack of consent here are indistinguishable from the plaintiffs' deficient allegations in *In re Google Assistant*. *See* FAC ¶ 59 ("They intercepted these communications with authorization and consent from Plaintiffs").[1]

**2. Quest's Cookie Notice discloses the conduct Plaintiffs complain about**

To sidestep their burden to plausibly allege lack of consent, Plaintiffs cherry-pick language from Quest's Cookie Notice and suggest they amount to a promise that Quest would not allow any cookies to collect personal identifiers from website visitors or use that information for targeted marketing. Opp. at 4-5. This argument lacks merit because the Cookie Notice must be read as a whole, not in isolated parts.[2]

The gravamen of Plaintiffs' claim is that Quest used the Pixel so it could later retarget website visitors with advertisements on Facebook. When read as a whole, the Cookie Notice expressly discloses that website visitors may receive targeted advertisements on other platforms (like Facebook) based on their website browsing history and activity on Quest's websites. For example, the Cookie Notice explains:

- "Some cookies can **collect personal information**, including information you disclose like your **username**, or **other identifiers that are collected together with your browsing history and activity, to deliver more relevant advertising content**."
- Targeting cookies "are **used to deliver online advertisements** both on and off websites visited that may be more relevant to visitor interests **based on activity from a website being browsed and based on a profile built of visitor interests**."
- "**[W]e do set targeting cookies on our sites to help us promote Quest's products and services to you on other sites and platforms**. **We also allow third parties to place cookies on our websites, and information collected via these cookies is used to provide you with information that may be of interest to you based on your**

[1] The cases Plaintiffs cite in footnote 1 did not involve CIPA or CMIA and thus are inapposite.
[2] In addition to the Cookie Notice – which Plaintiffs concede the Court can consider – the Court should consider the other website privacy policy information in the Hausmann and Rigal declarations under the incorporation by reference doctrine. The fact that Plaintiffs did not quote these exhibits in the FAC is irrelevant. Plaintiffs do not dispute authenticity and their claims are based on the contents of websites where these exhibits are located. *See, e.g.*, *Knievel v. ESPN*, 393 F.3d 1068, 1077 (9th Cir. 2005) (incorporation by reference doctrine permitted consideration of surrounding web pages beyond the portion of website attached to complaint).

**activities on our websites**. These targeting cookies do not directly store personal information (such as names or email addresses), but **store unique identifiers that identify to us and our partners a particular visitor's browser and/or device**."

- "[T]hird-party cookies, are placed on your computer when you visit our websites, but are stored by other service providers or third party domains. **We do not control the placing or use of information collected by such third-party cookies, and we are not responsible for third parties' use of cookies**. These companies have their own privacy policies and data collection practices. Please refer to each company's privacy policy to better understand the controls available to you. The purpose of the third-party cookies of which we are aware is to provide audience-measurement, limit repeat advertisements showed to you, social-sharing functions and to customize content or **advertising**."

Hausmann Decl., Ex. D (emphases added).

Additionally, the only cookies that Plaintiffs allege contain supposed personal identifiers (in the form of a Facebook ID) are the c_user and fr cookies, which are third-party cookies *set by Facebook*. FAC ¶¶ 31-33. Quest discloses that these cookies are controlled by Facebook and subject to Facebook's privacy policies. Indeed, while Quest notifies users that Quest does not "directly store personal information" in the targeting cookies it sets, Quest also explains that it "do[es] not control the placing or use of information collected by [] third-party cookies" and that such cookies are governed by other companies' "privacy policies and data collection practices." Hausmann Decl., Ex. D.

### 3. Plaintiffs' agreement to Facebook's policies is relevant to determining whether Plaintiffs plausibly alleged lack of consent

Contrary to Plaintiffs' argument, the Facebook Privacy Policies are relevant to determining whether Plaintiffs plausibly alleged lack of consent. Plaintiffs' theory of CIPA liability is that Quest aided and abetted an unlawful interception *by Facebook*. *E.g.*, FAC ¶¶ 59-60. As noted above, Quest's Cookie Notice discloses that third-party cookies are controlled by third-party privacy policies. If Plaintiffs – who both admit they created Facebook accounts – consented to Facebook's alleged interception, there is no unlawful interception on which to base aiding and abetting liability. In the face of Facebook's Privacy Policies – which clearly disclose tracking across third-party websites, *see* Moving Br. at 9-11 – Plaintiffs failed to plausibly allege lack of consent.

In arguing that Facebook's policies are insufficient, Plaintiffs point to *In re Meta Pixel Healthcare Litigation*, 2022 WL 17869218 (N.D. Cal. Dec. 22, 2022), in which the court denied a preliminary injunction that would have prohibited Facebook from collecting or using "patient information and communications from HIPAA-covered entities." But this case is inapposite.

First, despite Plaintiffs' characterization of the case, the court in *In re Meta Pixel* did not hold that the plaintiffs in that case did not consent to the data collection at issue. Rather, the court opined on the likelihood of success on the merits and noted, based on a limited evidentiary record, that in its view "it is unlikely that Meta will be able to establish that plaintiffs consented to the data." *Id*. at *10. Unlike in *In re Meta Pixel*, where Meta had the burden to establish a likelihood of success on the merits, here, *Plaintiffs* have the burden to plausibly allege *lack* of consent. A conclusory allegation that they did not consent is simply not sufficient in the face of Plaintiffs' undisputed agreement to both Facebook's and Quest's policies.

Second, *In re Meta Pixel* related only to the collection of information on a healthcare provider's patient portal, whereas Plaintiffs here challenge the use of the Pixel on both a patient portal (MyQuest) and a publicly-facing website (the General Website). *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 9 (9th Cir. 2018) ("Information available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by these statutes . . . ."). As to Plaintiffs' claims regarding the General Website, *Smith v. Facebook, Inc.* controls and makes clear that Plaintiffs did not and cannot plausibly allege that they did not consent to collection of their browsing activity. 262 F. Supp. 3d 943, 953-55 (N.D. Cal. 2017) (finding that Facebook users had consented to Facebook collecting information about their browsing public health-related websites like cancer.net). Notably, the *In re Meta Pixel* court recognized the difference between general website browsing and patient portals. 2022 WL 17869218 at *9 ("*Smith* involved users browsing through websites providing healthcare information to the public at large, not users navigating to patient portals on healthcare providers' websites.")

Finally, as to MyQuest, the *In re Meta Pixel* court focused heavily on HIPAA's requirements and found that, under that statute, patient status is protected health information. *Id.* at *8-9. But HIPAA requirements were directly at issue in *In re Meta Pixel* because the plaintiffs'

alleged HIPAA violations. *Id.* Plaintiffs here have not alleged a HIPAA violation; in fact, the FAC does not even mention HIPAA.[3]

**B. Plaintiffs have not plausibly alleged that Facebook intercepted the "contents" of any communication**

Plaintiffs' opposition makes clear that they have not plausibly alleged that Facebook intercepted the "contents" of any of their communications with the General Website or MyQuest (which they refer to as the "Patient-Protected Website"). As to the General Website, the only thing Plaintiffs have alleged is that they "accessed" the "main page, www.questdiagnostics.com." Opp. at 1; *see also* FAC ¶¶ 4-5. Upon visiting the main page, Plaintiffs say they immediately navigated to MyQuest and accessed their accounts.

Based on their own description, no communication "contents" could have been intercepted during Plaintiffs' use of the General Website because the only interaction alleged is that Plaintiffs viewed the www.questdiagnostics.com home page. A webpage address such as www.questdiagnostics.com simply "identifies the location of a webpage a user is viewing on the internet." *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014). The Ninth Circuit has held that this information functions like an address and therefore "does not meet the definition of 'contents,' because these pieces of information are not the 'substance, purport, or meaning' of a communication." *Id.*

In arguing to the contrary Plaintiffs rely heavily on "exemplar" "full-string URLs" in FAC Figure 5, which Plaintiffs insist contain "user-entered and user-specific information that constitutes content." Opp. at 8. But there are two fatal flaws with this argument. First, Plaintiffs do not allege that *they* viewed these "exemplar" URLs or that *they* experienced an improper interception related to these URLs (or any other URLs). Nor, for that matter, do they allege an interception of any of *their* user-entered or user-specific information on the General Website. In fact, Plaintiffs allege the exact opposite. As to the General Website, Plaintiffs say they merely viewed the main page—www.questdiagnostics.com—before navigating to MyQuest (which is discussed below). Opp. at 1;

[3] Plaintiffs' reliance on the December 1, 2022 HHS Bulletin about HIPAA Rules is misplaced for similar reasons. Opp. at 6-7. Notably, both the *In re Meta Pixel* case and the December 2022 HHS Bulletin were available long before Plaintiffs filed the FAC.

FAC ¶¶ 4-5. That some unidentified person may have viewed the URL in FAC Figure 5 or experienced disclosure of the ButtonClick or Microdata in Figures 7 and 8 cannot be the factual basis for *Plaintiffs* to assert CIPA claims. Instead, Plaintiffs must plausibly allege that *they personally* were victims of an improper interception of the contents of *their* communications with the General Website. They have not done so. Indeed, "without factual allegations about Plaintiffs' specific experiences, the claims against Defendants are merely 'conceivable,' not 'plausible,'" and must be dismissed.[4] *Sanchez v. Ritz Carlton*, 2015 WL 5009659, at *2-3 (C.D. Cal. Aug. 17, 2015) (granting motion to dismiss because "a complaint must include plausible factual allegations that the plaintiff was a victim of the defendant's alleged violations …. Allegations that speak only to class members generally are insufficient to state a claim.").

Second, Plaintiffs' argument that everything after the ".com" in a URL constitutes the "contents" of a communication because it purportedly reveals details about a specific webpage visited or requested is irreconcilable with the Ninth Circuit's holding in *Zynga*. Opp. at 9. To be sure, the *Zynga* Court acknowledged there *might* be circumstances where a URL potentially "could amount to a disclosure of the contents of a communication" – if, for example, it divulged specific search terms inputted by the visitor into a search engine. *Id.* at 1108-09. But the Court expressly rejected the plaintiffs' argument that disclosure of a referer header (which includes the URL) is a disclosure of the "contents" of a communication because it discloses specific webpages visited, finding that such URLs "function[] like an 'address,'" and not "content." *Id*. at 1107-08.

This same reasoning from *Zynga* applies to the "Allergy-Asthma" URL in FAC Figure 5. Even if Plaintiffs had alleged that they accessed this URL (which they did not), it merely indicates that a person visited a webpage about allergy tests, not any communication "contents." There are no allegations in the FAC to suggest that this URL resulted from *user*-inputted search terms, *user* queries, or other *user*-generated material, as opposed to a user merely navigating to the relevant page. Thus, as in *Zynga*, Plaintiffs have failed to allege that the "contents" of any communications were intercepted. *See* 750 F.3d at 1107-08. For the same reason, Plaintiffs' reliance on *In re Meta*

[4] The ButtonClick and Microdata in FAC Figures 7 and 8 is not alleged to be from Plaintiffs' personal experience, and Plaintiffs do not otherwise allege facts indicating that their ButtonClick or Microdata was intercepted during their visits to the General Website.

*Pixel* is misplaced. *See* Opp. at 8-9. The transmitted URLs in that case included a search "query string" indicating that the user conducted a search on the website for specific health information (*i.e.*, user-inputted search terms). 2022 WL 17869218, at *11 n.10. Plaintiffs have not alleged that *they* inputted any search terms or queries here; in fact, their allegations confirm they did not.[5]

As to their visit to MyQuest, Plaintiffs likewise have not plausibly alleged that the "contents" of their communications were intercepted. Plaintiffs say they logged into MyQuest, viewed their test results, and logged out. Opp. at 1; FAC ¶¶ 4-5. Presumably, Plaintiffs are suggesting that FAC Figure 6 is representative of their MyQuest experience and is the communication allegedly intercepted. FAC Figure 6 contains a URL that reads "myquest.questdiagnostics.com/results/" along with a lengthy and indecipherable string of letters, numbers, and symbols. Even affording Plaintiff all reasonable inferences, this appears to be the URL for the page Plaintiffs viewed and does not constitute the "contents" of any communication under *Zynga*. *See* 750 F.3d at 1107-08. Again, Plaintiffs do not allege that this information contains any *user*-inputted search terms or other *user*-generated material, nor do they even attempt to explain the string of letters, numbers, and symbols. And because the information in FAC Figure 6 plainly does not reveal any actual medical condition, the nature of any test taken, test results, or any other information, it does not reveal the "substance, purport, or meaning" of any communication between Plaintiffs and Quest. *See id.* In a blatant appeal to sensationalism, Plaintiffs suggest in their opposition that it is theoretically possible that a phrase such as "hepatis positive test result" "may" have been disclosed in Microdata, *see* Opp. at 2, but this is speculative hyperbole that is not supported by a single well-pleaded allegation of fact in the FAC. To survive dismissal Plaintiffs must do more than suggest a mere "possibility" of liability; they must plead facts that plausibly suggest an entitlement to relief. *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 995-96 (9th Cir. 2014). They have not done so, thus their CIPA claims should be dismissed.

//

---

[5] *In re Google Inc. Cookie Placement Consumer Privacy Litigation*, 806 F.3d 125 (3d Cir. 2015) likewise is inapposite because it dealt with URLs resulting from user queries. To the extent Plaintiffs purport to rely on this case for a broader reading of "contents" than that set forth in *Zynga*, the Ninth Circuit's decision in *Zynga* controls here.

### C. Plaintiffs did not plausibly allege disclosure of "medical information"

Plaintiffs argue that they plausibly alleged a disclosure of "medical information" because the information purportedly disclosed shows "at a minimum, that a patient has received and is accessing test results." Opp. at 14. Plaintiffs also argue that they sufficiently alleged that the information disclosed individually identified them. Plaintiffs are wrong on both counts.

Plaintiffs do not dispute that to be "medical information" under CMIA, the information must include "*substantive information* regarding a patient's medical condition or history." *Eisenhower Med. Ctr. v. Superior Court*, 226 Cal. App. 4th 430, 434 (Cal. Ct. App. 2014) (emphasis added). Moreover, Plaintiffs do not dispute that the mere fact that a patient has received an unspecified test is not "medical information" because the *Eisenhower* court held that "[c]onfirmation that a person's medical record exists somewhere is not medical information as defined under the CMIA," nor is "the mere fact that a person may have been a patient." *Id*. at 435-36.

Instead, in their effort to avoid dismissal Plaintiffs rely almost exclusively on *Tamraz v. Bakotic Pathology Associates, LLC*, 2022 WL 16985001 (S.D. Cal. Nov. 16, 2022), which found that an alleged disclosure of "specimen or test information" was sufficient to meet the "substantive information" prong. *See* Opp. at 15. However, what Plaintiffs fail to mention is that the *Tamraz* court denied the motion to dismiss because the plaintiffs alleged that the actual "*results* of test[s] and the *types* of specimens [were] included" in what was disclosed. *Id*. at *5 and n.4 (emphases added). Unlike in *Tamraz*, the FAC here is devoid of well-pleaded factual allegations suggesting that any of the information disclosed revealed an actual medical condition of Plaintiffs, the types of the tests they took, or the results. Consistent with *Eisenhower*, Plaintiffs' CMIA claims should be dismissed.

As to whether Plaintiffs sufficiently alleged disclosure of individually identifiable information, they did not for the reasons explained in Quest's Moving Brief at 21-22. Plaintiffs criticize Quest for identifying details missing from their allegations, such as the lack of allegations that they were logged in to Facebook when they visited Quest's websites, that they visited the websites using the same browser or device they used to visit Facebook, and that they had not cleared

cookies on their device prior to visiting Quest's websites – all of which relate to Plaintiffs' theory that purported personal identifiers were shared through one or more types of cookies identified in the FAC. *See* Opp. at 16-17. Notably, Plaintiffs do not contend that these missing details are irrelevant or immaterial. Instead, they urge the Court to ignore them as "counterfactual" and based on "supposition" in view of their (conclusory) allegation that their individually identifiable information was disclosed. *Id.* at 16. This argument attempts to turn the *Twombly*/*Iqbal* standard on its head. Plaintiffs must do more than just plead facts that are consistent with Quest's liability; they must allege factual detail that is sufficient to "nudge their claims across the line from conceivable to plausible."[6] *Eclectic*, 751 F.3d at 996-97 (cleaned up, citation omitted).

Finally, to satisfy CMIA's definition of "medical information," the individually identifiable information must be "in possession of or derived from a provider of health care." Cal. Civ. Code § 56.05(i). Plaintiffs' theory is that their Facebook IDs and other Facebook identifiers are the purported individually identifiable information. FAC ¶¶ 30-33. But they do not plausibly allege that this information was in Quest's possession or derived from Quest (as opposed to Facebook).

**D. Plaintiffs have not plausibly alleged that Quest was the disclosing party**

Throughout their pleading Plaintiffs allege that *Facebook* intercepted Plaintiffs' communications with Quest. This is inconsistent with a conclusion that Quest disclosed information to Facebook, which Plaintiffs must plausibly allege to support their CMIA claim. Plaintiffs seem to suggest that Quest's mere installation of the Pixel – which is publicly-available code – on its website is an affirmative communicative act for purposes of a CMIA disclosure. *See* Opp. at 17. But Plaintiffs offer no support for this strained argument. There is a difference between an affirmative disclosure (which Plaintiffs do not plausibly allege) and assisting another's alleged interception of such information (which Plaintiffs allege throughout their pleading). *See Sutter Health v. Superior Court*, 227 Cal. App. 4th 1546, 1555-56 (Cal. Ct. App. 2014) (under CMIA,

---

[6] For similar reasons, the Court should dismiss Plaintiff Roche's claim due to her failure to plausibly allege that the Pixel was even active on Quest's websites at the time of her visit in March 2022. Roche argues that whether or not the Pixel was active when she visited the website is "a factual question to be determined through discovery," Opp. at 17, but this puts the cart before the horse. Before she can proceed to discovery, Roche must first allege sufficient facts that plausibly suggest an entitlement to relief. She has not done so.

"disclosure occurs when the health care provider affirmatively shares medical information").

Furthermore, Plaintiffs allege that *Facebook* – not Quest – owned the cookies that contained a Facebook ID. FAC ¶¶ 31-33. They do not allege that Quest had access to this information such that Quest could itself have disclosed it. Even if Quest's installation of cookies that collected event data constituted a disclosure (and it does not) and even if that event data included health information (and it did not), the disclosure of health information that is not personally identifiable is not a disclosure of "medical information" under CMIA.

Despite Plaintiffs' mischaracterization, *Belozerov v. Gannett Co.*, 2022 WL 17832185 (D. Mass. Dec. 20, 2022), merely rejected an argument by the defendant that Facebook, not the defendant, installed the Pixel, because the argument ignored contrary allegations in the pleading. It did not reject any argument that, on the face of the pleading, the defendant did not have access to a Facebook ID such that it could not have disclosed it. Because Plaintiffs have not adequately alleged that Quest is the party that disclosed "medical information" within the meaning of the CMIA, the claim should be dismissed.

Finally, while Plaintiffs point out that the CMIA prohibits not just disclosure, but also the use of health information for marketing without adequate consent, Plaintiffs have not alleged the barest of facts to suggest that Quest ever used Plaintiffs' medical information for such purposes. Not only do Plaintiffs not allege what particular health information of *theirs* was purportedly disclosed or used, they do not allege that they ever saw ads for Quest or its products or even conclusorily allege that their own health information was used for marketing purposes. Thus, their pleading does not support a CMIA claim based on marketing.

## III. CONCLUSION

For the foregoing reasons and the reasons in Quest's Moving Brief,[7] the Court should dismiss Plaintiffs' claims. Because Plaintiffs did not cure any of the deficiencies that Quest identified in its motion to dismiss the original Complaint, the dismissal should be with prejudice.

//

[7] Plaintiffs' preemption argument relies on non-binding cases that reach a different conclusion on the issue than the cases in Quest's Moving Brief. Quest previously addressed the contrary authority and explained why Quest's cases are persuasive, so no reply is necessary on this point.

Dated: May 2, 2023

FAEGRE DRINKER BIDDLE & REATH LLP

By: */s/ Zoë K. Wilhelm*

Zoë K. Wilhelm
Matthew J. Fedor (admitted *pro hac vice*)

***Attorneys for Defendant***
***Quest Diagnostics Incorporated***