**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANGELA COLE and BEATRICE ROCHE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS, INC.,<br><br>Defendant. | Case No. 2:23-cv-20647-WJM-JSA |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS THE CLASS ACTION COMPLAINT**

**BURSOR & FISHER, P.A.**
Philip L. Fraietta
1330 Avenue of the Americas
New York, New York 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
pfraietta@bursor.com

**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
James E. Cecchi
Kevin G. Cooper
5 Becker Farm Rd.
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**PAGE(S)**


INTRODUCTION .......... 1

LEGAL STANDARD AND OBJECTIONS TO EVIDENCE .......... 4

ARGUMENT .......... 5

I. DEFENDANT HAS NOT ESTABLISHED CONSENT .......... 5

II. FACEBOOK IS NOT A PARTY TO THE INTERCEPTED COMMUNICATIONS .......... 12

III. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANT ASSISTED FACEBOOK WITH INTERCEPTING THE "CONTENTS" OF THEIR COMMUNICATIONS .......... 15

IV. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANT DISCLOSED PROTECTED MEDICAL INFORMATION .......... 18

V. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANT IS THE DISCLOSING PARTY .......... 22

VI. THE CHOICE OF LAW CLAUSES ARE INAPPLICABLE TO PLAINTIFFS' CLAIMS .......... 25

VII. ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND .......... 28

CONCLUSION .......... 28

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**


*Almaznai v. S-L Distrib. Co., LLC*,
2021 WL 4457025 (N.D. Cal. June 21, 2021) .......... 5

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 4

*Balanzar v. Fid. Brokerage Servs., LLC*,
654 F. Supp. 3d 1075 (S.D. Cal. 2023) .......... 3, 25, 26

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) .......... 4

*Belozerov v. Gannett Co., Inc.*,
2022 WL 17832185 (D. Mass. Dec. 20, 2022) .......... 24

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D Cal. 2021) .......... 6, 7, 8

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) .......... 6

*Campbell v. Facebook, Inc.*,
77 F. Supp. 3d 826 (N.D. Cal. 2014) .......... 8

*Clark-Alonso v. Sw. Airlines Co.*,
440 F. Supp. 3d 1089 (N.D. Cal. 2020) .......... 26

*Cole v. Quest Diagnostics, Inc.*,
2023 WL 6201702 (E.D. Cal. Sept. 22, 2023) .......... 11

*Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*,
132 Cal. App. 4th 1466 (2005) .......... 11

*Czarnionka v. Epoch Times Ass'n*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) .......... 24

*Delgado v. Meta Platforms*,
2024 WL 818344 (N.D. Cal. Feb. 27, 2024) .......... 27

*Doe v. Meta Platforms*,
2023 WL 5837443 (N.D. Cal. Sept. 7, 2023) .......... 14

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) .......... 7

*Eisenhower Medical Center v. Superior Court*,
226 Cal. App. 4th 430 (2014) .......... 21

*Erceg v. LendingClub Corp.*,
475 F. Supp. 3d 1071 (N.D. Cal. 2020) .......... 27

*Hammerling v. Google LLC*,
2022 WL 2812188 (N.D. Cal. July 18, 2022) .......... 17, 18

*Hayes v. Delbert Servs. Corp.*,
811 F. 3d 666 (4th Cir. 2016) .......... 26

*Hedges v. United States*,
404 F.3d 744 (3d Cir. 2005) .......... 4

*Holomaxx Techs. v. Microsoft Corp.*,
783 F. Supp. 2d 1097 (N.D. Cal. 2011) .......... 5

*Hunter v. Dematic USA*,
2016 WL 2904955 (D.N.J. May 18, 2016) .......... 28

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. Apr. 9, 2020) .......... 17, 19, 21

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) .......... 5

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
806 F. 3d 125 (3d Cir. 2015) .......... Passim

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) .......... 6

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) .......... 16

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) .......... 7

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. Dec. 22, 2022) .......... Passim

*In re Nickelodeon Consumer Priv. Litig.*,
2014 WL 3012873 (D.N.J. July 2, 2014) .......... 15

*In re Vizio, Inc. Consumer Priv. Litig.*,
2017 WL 11420284 (C.D. Cal. July 25, 2017) .......... 16

*In re Yahoo Mail Litig.*,
308 F.R.D. 577 (N.D. Cal. 2015) .......... 27

*In re Zynga Priv. Litig.*,
750 F.3d 1098, 1106 (9th Cir. 2014) .......... 15

*Katz-Lacabe v. Oracle America, Inc.*,
2023 WL 2838118 (N.D. Cal. Apr. 6, 2023) .......... 17

*Malleus v. George*,
641 F.3d 560 (3d Cir. 2011) .......... 4

*Oliver v. Noom*,
2023 WL 8600576 (W.D. Pa. Aug. 22, 2023) .......... 8

*Phillips v. Cnty. of Allegheny*,
515 F.3d 224 (3d Cir. 2008) .......... 28

*Pistone v. Rushmore Serv. Ctr., LLC*,
2022 WL 16834672 (D.N.J. Nov. 9, 2022) .......... 25

*Popa v. Harriet Carter Gifts*,
426 F. Supp. 3d 108 (W.D. Pa. 2019) .......... 8

*Popa v. Harriet Carter Gifts, Inc.*,
52 F.4th 121 (3d Cir. 2022) .......... 2, 14

*Regents of Univ. of Cal. v. Superior Court*,
220 Cal. App. 4th 549 (2013) .......... 22

*Revitch v. New Moosejaw, LLC*,
2019 WL 5485330 (N.D. Cal. Oct. 23, 2019) .......... 12

Riley v. Timmons Constr. LLC,
2022 WL 597356 (W.D. Pa. Feb. 28, 2022) .......... 28

*Risher v. Adecco Inc.*,
2020 WL 13505422 (N.D. Cal. Feb. 14, 2020) .......... 6

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015) ..... 7

*Ryabyshchuk v. Citibank (S. Dakota) N.A.*,
2011 WL 5976239 (S.D. Cal. Nov. 28, 2011) ..... 6

*Schreiber Distrib. Co. v. Serv-Well Furniture Co.*,
806 F.2d 1393 (9th Cir. 1986) ..... 28

*SEC v. Prakash*,
2024 WL 781037 (N.D. Cal. Feb. 26, 2024) ..... 4

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ..... 8

*Spy Optic, Inc. v. Alibaba.com, Inc.*,
163 F. Supp. 3d 755 (C.D. Cal. 2015) ..... 5

*Stasi v. Inmediata Health Grp. Corp.*,
501 F. Supp. 3d 898 (S.D. Cal. 2020) ..... 22

*Tamraz v. Bakotic Pathology Assocs., LLC*,
2022 WL 16985001 (S.D. Cal. Nov. 16, 2022) ..... 20, 21

*Williams v. Medley Opportunity Fund II, LP*,
965 F.3d 229 (3d Cir. 2020) ..... 3, 26

**STATUTES**

18 U.S.C. § 2511(2)(d) ..... 14

Cal. Civ. Code § 56.05(i) ..... 18

Cal. Civ. Code § 56.10(a) ..... 18, 22

Cal. Civ. Code § 56.10(d) ..... 22

Cal. Civ. Code § 56.11 ..... 11

Cal. Pen. Code. § 630 ..... 27

Cal. Pen. Code § 631(a) ..... 15

**RULES**

Fed. R. Civ. P. 12(b)(6) ..... 4

## INTRODUCTION

Plaintiffs Angela Cole and Beatrice Roche ("Plaintiffs"), two residents of California, bring this action against Quest Diagnostics, Inc. ("Quest" or "Defendant"), their healthcare provider. In August 2019 and March 2022, Ms. Cole and Ms. Roche respectively ordered diagnostic tests from Defendant through their primary care physicians. When they received the results for those tests, they accessed Defendant's website, www.questdiagnostics.com (the "General Website"), and they navigated to a page with a secure portal, www.myquest.questdiagnostics.com (the "Patient-Protected Website"), where they logged in, reviewed their confidential results, and logged out. Unbeknownst to Plaintiffs, throughout that process—from the moment they accessed Defendant's main page to the moment they opened their results—someone was looking over their shoulders, quietly learning what content they requested, which webpages they viewed, and which buttons they clicked. That someone was Meta Platforms, Inc., also known as Facebook, the world's largest social media website.

This privacy invasion occurred by design, not by accident, because Defendant installed the "Facebook Tracking Pixel" (hereafter, "the Pixel") on its website and programmed it to quietly listen in on patients' communications with Defendant. The Pixel is a piece of source code that companies, like Defendant, can integrate into their websites by incorporating it in the source code. When a person visits a website that contains the Pixel, the Pixel tracks their actions across the website and transmits the information—including the user's private communications (HTTP Requests), personal identifying information, and information about their past, present, or future medical conditions and/or treatment—to Facebook's servers. The information Facebook receives is transmitted alongside the website visitor's "c_userID" (i.e., Facebook ID) which associates and links that information to the visitor's Facebook profile. Facebook then takes the event data it

receives from websites like Defendant's and matches it to users' Facebook accounts.

None of this would have happened but for Defendant's decision to install the Pixel. Although the Pixel is automatically configured to collect certain data, companies like Defendant, can instruct the Pixel to capture more specific pieces of information, and Defendant also determines how its website visitors' communications are categorized. Ms. Cole and Ms. Roche therefore allege that, by placing this tracking tool on the General Website and Patient-Protected Website, Defendant knowingly disclosed their medical information to Facebook and intentionally assisted the social media giant with intercepting their communications.

None of Defendant's arguments warrant dismissal. Defendant first asserts that Plaintiffs consented to the wiretap, but Plaintiffs' consent is irrelevant because Defendant expressly warranted to patients that it would not share event data that was linked to personally identifiable information.

Next, Defendant claims that Facebook was a party to the communications and therefore cannot have intercepted them. But Facebook was not a party to Plaintiffs' communications with Quest, and Defendant's argument is belied by the Third Circuit's analysis in *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022). Defendant then argues that it never helped Facebook intercept the "content" of Plaintiffs' communications. By electing to embed the Pixel onto its website configuring the parameters of the Pixel, and disclosing full-string URLs containing patient information and related microdata, however, Defendant did exactly that.

Defendant then turns to Plaintiffs' claims under the Confidentiality of Medical Information Act ("CMIA"), arguing that Plaintiffs fail to allege that it disclosed medical information. That argument, however, ignores the fact that: (1) test information fits neatly within the CMIA's definition of medical information; and (2) the data Facebook received was not limited to URLs,

but also included microdata that reveals additional information about the website visitor's communications. For example, the phrase "hepatitis positive test result" may not appear in the URL of a particular webpage, but the webpage's microdata sent to Facebook may nonetheless reveal the visitor's medical condition because microdata includes the text, titles, headers, images, image captions, links, and other information located on the webpage, and this is true regardless of whether that information appears in the URL.

Defendant next asserts that it cannot constitute the disclosing party. But by integrating the Pixel into its websites and causing information to be transmitted, Defendant engaged in an affirmative communicative act that resulted in the information being disclosed. Moreover, the disclosures in question are not limited to data transmission sent via the website visitors' browsers but also include server-to-server data transmissions wherein Defendant's server sent information about its website visitors' communications directly to Facebook's server.

Finally, Defendant asserts Plaintiffs' claims must be dismissed because they arise under California law and, according to Defendant, Plaintiffs' claims are governed by New Jersey law. But courts considering similar choice of law provisions have held that they do not encompass tort claims like those asserted here which are separate and untethered from the agreement at issue. *See, e.g.*, *Balanzar v. Fid. Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1080-81 (S.D. Cal. 2023). Moreover, Defendant's attempt to prevent California residents from effectuating their statutorily-granted rights through a non-negotiable adhesion contract would be an improper and unconscionable prospective waiver of said rights. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 241 (3d Cir. 2020).

As detailed further herein, Defendant's motion to dismiss must be denied in full.

**<u>LEGAL STANDARD AND OBJECTIONS TO EVIDENCE</u>**

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint if the plaintiff fails to state a claim upon which relief can be granted. The movant bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). In deciding a motion to dismiss under Rule 12(b)(6), "all allegations in the complaint must be accepted as true, and the plaintiff must be given the benefit of every favorable inference to be drawn therefrom." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"A court generally cannot consider materials outside the pleadings on a motion to dismiss for failure to state a claim. . . . Under the incorporation by reference doctrine, courts may consider documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the plaintiff's pleading." *SEC v. Prakash*, 2024 WL 781037, at *3 (N.D. Cal. Feb. 26, 2024) (cleaned up).

Based on these principles, Plaintiffs object to the majority of the extrinsic documents that Defendant has submitted in support of its motion.[1] Specifically, Plaintiffs object to Exhibits A, B,

[1] Exhibit D to the Hausmann Declaration is quoted in the First Amended Complaint ("FAC") at ¶ 41. Thus, Plaintiffs do not object to incorporation by reference of Exhibit D to the Hausmann Declaration (ECF 51-3).

and C  of the Hausmann Declaration (Quest's various Privacy Policies) (ECF 51-3), the Rigal Declaration in its entirety (ECF 51-2), and Exhibits C, D, and E to Lattimore Declaration (ECF ECF 51-4). These exhibits and accompanying narrative are not quoted in the FAC and are not relied upon by Plaintiffs. Plaintiffs do not admit to their authenticity, having had no opportunity to take discovery. These documents therefore cannot be considered under the incorporation by reference doctrine. Nor has Defendant requested judicial notice of them, presumably because they are not judicially noticeable. *See, e.g.*, *Almaznai v. S-L Distrib. Co., LLC*, 2021 WL 4457025, at *3-4 (N.D. Cal. June 21, 2021) (refusing to consider consumer agreement not attached to complaint because "under *Khoja*, the Court may consider the Agreement of Sale under the incorporation-by-reference doctrine only if [the plaintiff's] claims necessarily depend on it."); *Holomaxx Techs. v. Microsoft Corp*., 783 F. Supp. 2d 1097 (N.D. Cal. 2011) (declining to consider provider's website service agreement because, even though complaint referenced terms of service agreement, reference was insufficient to trigger incorporation by reference doctrine); *see also Spy Optic, Inc. v. Alibaba.com, Inc*., 163 F. Supp. 3d 755, 763 (C.D. Cal. 2015) ("[P]rivate corporate websites, particularly when describing their own business, generally are not the sorts of sources whose accuracy cannot reasonably be questioned").

## ARGUMENT

### I. DEFENDANT HAS NOT ESTABLISHED CONSENT

Defendant first argues that "Plaintiffs have failed to plausibly allege facts suggesting they did not consent to or authorize the collection of information about their visits to Quest's website by the Facebook Pixel." ECF 51-1 ("MTD") at 10. As an initial matter, it is Defendant's burden, not Plaintiffs', to establish consent. *See In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 823 (N.D. Cal. 2020) ("As the party seeking the benefit of an exception, Defendants have the burden to establish the existence of consent."). And Defendant has failed to carry that burden,

declining to address its repeated representations to patients that it would refrain from sharing event data paired with direct identifiers.[2]

"Consent to an interception can be explicit or implied, but any consent must be actual." *In re Google Inc.*, 2013 WL 5423918, at *12 (N.D. Cal. Sept. 26, 2013). "In order for consent to be actual, the disclosures must explicitly notify users of the practice at issue." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1063 (N.D Cal. 2021) (internal quotations omitted). Moreover, "consent is not an all-or-nothing proposition," *see Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 623 (N.D. Cal. 2021) (internal quotations omitted), and so "a reviewing court must inquire into the dimensions of the consent and then ascertain whether the interceptions exceeded those boundaries." *See Brown*, 525 F. Supp. 3d at 1067 (internal quotations omitted). "The disclosures must have only one plausible interpretation for a finding of consent." *Calhoun*, 526 F. Supp. 3d at 620.

Defendant uses four types of cookies: "strictly necessary cookies," "performance cookies," "functional cookies," and "targeting cookies." *See* ECF 51-2 (Hausmann Decl.), Ex. D. Defendant's Pixel, which Defendant integrated into its General Website and Patient-Protected Website, intercepts website visitors' communications alongside "performance" or "targeting" cookies. *Compare* FAC ¶ 14 ("Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.") *with* Ex. D (explaining performance

---

[2] Furthermore, consent is not properly raised in a motion to dismiss because it is an affirmative defense. *Risher v. Adecco Inc.*, 2020 WL 13505422, at *3 (N.D. Cal. Feb. 14, 2020) ("[I]t is not incumbent on plaintiff to plead facts refuting any possible affirmative defense, and resolution of the scope of any consent must await development of the record."); *Ryabyshchuk v. Citibank (S. Dakota) N.A.*, 2011 WL 5976239, at *5 (S.D. Cal. Nov. 28, 2011) ("[A] motion for summary judgment—rather than a motion to dismiss—is the proper place for the creditor to establish that the consumer's claim fails due to the presence of prior express consent.").

cookies "collect information about how visitors use a website, such as the number of visitors browsing the site or a particular section of the site") *and id.* (explaining that targeting cookies "are used to deliver online advertisements both on and off websites visited that may be more relevant to visitor interests based on the activity from a website being browsed"). For both types of cookies, Defendant explicitly disclaims sharing event data that is associated with direct identifiers. *See id.* (stating that performance cookies only collect "aggregated and therefore anonymous" information, not "information that identifies a specific user"); *id.* (stating that targeting cookies "do not directly store personal information," only information identifying "a particular visitor's browser and/or device"); FAC ¶ 41 (same).

Notwithstanding these disclaimers, Defendant used the Pixel "to ***link to Facebook IDs and corresponding Facebook profiles***," and thereby sought to "pair event data with personally identifiable information so it [could] later ***retarget patients*** on Facebook." *See* FAC ¶¶ 39-40 (emphasis added); *see also Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Cir. 2017) ("A Facebook link or an email address may well readily enable an ordinary person to identify an individual."); *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("The Facebook User ID . . . personally identifies a Facebook user."); *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("A Facebook ID, as the *Hulu* court found, is thus equivalent to a name—it stands in for a specific person, unlike a device identifier."). Thus, by acting contrary to its express representations, Defendant foreclosed any argument that it received consent for the alleged conduct. *See Brown*, 525 F. Supp. 3d at 1063 ("Google cannot demonstrate that Plaintiffs expressly consented because Google did not notify users that it would be engaging in the alleged data collection while Plaintiffs were in private browsing mode."); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793-94 (N.D. Cal. Dec. 22, 2022) ("I am skeptical that a reasonable

user who viewed Meta's policies would have understood that Meta was collecting protected health information.").

Defendant's reliance on *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943 (N.D. Cal. 2017) is misplaced. Defendant first asserts that *Smith* stands for the unremarkable proposition that, if written appropriately, a privacy policy can establish consent. *See* MTD at 14 (referencing the Cookie Policy but declining to quote any specific language that Defendant thought was analogous). But as previously explained, "the disclosures must explicitly notify users of the practice at issue," *see Brown*, 525 F. Supp. 3d at 1063, and here, Defendant's Cookie Policy does the opposite—i.e., reassuring patients that Defendant only uses tracking tools that collect aggregated, anonymous information. FAC ¶ 41 ("Quest Diagnostics expressly warrants that it will never conspire with a third[] party to intercept usage data paired with personally identifiable information.").

Defendant's proffered cases within this Circuit also do not support its position. In *Popa v. Harriet Carter Gifts*, 426 F. Supp. 3d 108 (W.D. Pa. 2019), the court merely stated that "[a] court must consider the scope of the alleged consent when evaluating a privacy statement," while denying the motion for lack of a developed factual record. *Id.* at 119; *see also Oliver v. Noom,* 2023 WL 8600576, at *9 (W.D. Pa. Aug. 22, 2023) ("A more developed factual record is needed to determine whether Plaintiffs consented to the challenged activity.").

Defendant then attempts to evade its own privacy violations by hiding behind the policies of the third-party app developer, Facebook. Specifically, Defendant argues *Smith* supports the notion that, by agreeing to Facebook's Terms of Service, "Plaintiffs expressly consented to Facebook collecting their browsing activity and other data." *See* MTD at 23. But again, Defendant's specific representations cannot be superseded by any purported agreement with Facebook, especially not one which only generally contemplates that Facebook might sometimes

collect information about the actions they take on the Internet. *See Campbell v. Facebook, Inc.*, 77 F. Supp. 3d 826, 848 (N.D. Cal. 2014) ("[A]ny consent with respect to the processing and sending of messages itself does not necessarily constitute consent to the specific practice alleged in this case—that is, the scanning of message content for use in targeted advertising."). To hold otherwise would lead to absurdity. Under Defendant's theory, Defendant could post a cookie policy that says, "Quest Diagnostics does not—and never will—use the Meta Pixel," and still shield itself from liability by referencing the general terms to which Facebook users agree when creating an account. That cannot be correct.

Even if Defendant were to persuade the Court that Plaintiffs consented to the invasion of their privacy by accessing the General Website, that argument must fail for users of the Patient-Protected Website because Defendant assisted Facebook with intercepting protected health information. As discussed below, the CMIA protects the health information at issue. *See infra* Section D. And so does the Health Insurance Portability and Accountability Act ("HIPAA"), which "defines 'protected health information' as 'individually identifiable' information that is 'created or received by a healthcare provider' (or similar entities) that '[r]elates to the past, present, or future physical or mental health or condition of an individual' or the 'provision of health care to an individual.'" *See In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *8 (quoting 45 C.F.R. § 160.103). Of note, in response to the use of Pixel tracking by HIPAA-covered entities, the Department of Health & Human Services recently issued a Bulletin reminding website owners that use of these tools can result in impermissible disclosures:

> The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not**

> **permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.
>
> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. … Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.

*Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH & HUMAN SERV., https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (emphasis in original).

As a recent decision from the Northern District of California explains, "the URLs and other information transmitted through the Pixel establish that a user is about to log in to a healthcare provider's website," and so "the Pixel captures information that connects a particular user to a particular healthcare provider—*i.e.*, patient status—which falls within the ambit of information protected under HIPAA." *See In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *9. Critically, in that decision Judge Orrick carefully reviewed Facebook's Terms of Service and concluded that "Meta's policies do not [] specifically indicate that Meta may acquire health data obtained from Facebook users' interactions with their medical providers' websites." *Id.* "Its generalized notice is ***not sufficient to establish consent***." *Id.* (emphasis added); *see also Rickwalder v. Meta Platforms, Inc.*, 21-cv-383-3231, at 26 (Cal. Sup. Ct. Sept.

15, 2022) ("In sum, Facebook does not show that Plaintiffs—specifically, Ms. McDaniel—consented to HBO's disclosure of personally identifiable information to Facebook in violation of the VPPA.") (attached as exhibit A).

Here, too, Facebook's alleged disclosures are insufficient to establish consent. And the instant transmissions go a step further, establishing that Plaintiffs successfully logged into the Patient-Protected Website and accessed test results for specific conditions. *See, e.g.*, FAC ¶ 68 (alleging Defendant "disclosed the URL of the webpage a patient accessed to review test results"). By declining to even suggest that it obtained HIPAA-compliant consent, Defendant effectively concedes that it never received Plaintiffs' consent to share protected health information from the Patient-Protected Website.[3]

Finally, Defendant attempts to turn the order transferring the case to this District into a finding that Plaintiffs consented. *Cole v. Quest Diagnostics, Inc.*, 2023 WL 6201702, at *4 (E.D. Cal. Sept. 22, 2023). Defendant's reading is a severe overstatement of the holding. In considering Quest's motion, Judge Thurston was required to determine whether the action falls within the scope of Quest's forum selection clause. *Id.* at *2 ("Before the Court can decide whether the parties' forum selection clause should be enforced, it must interpret the clause and determine its scope."). The question was whether the claims in the action are related to the Terms and Conditions for use of Quest's website. *Id.* at *3. This Court's interpretation must take into account that, in its Terms and Conditions, Quest expressly warrants that it will never conspire with a third

[3] The CMIA imposes even more strenuous consent requirements pursuant to Cal. Civ. Code § 56.11 (requiring handwritten or typewritten authorization of at least 14-point type, authorization provision must be separate form any other language on the same page, executed by a standalone signature, and enumerates all specific uses and limitations). Authorizations failing to satisfy these requirements are deemed invalid. *Colleen M. v. Fertility & Surgical Assocs. of Thousand Oaks*, 132 Cal. App. 4th 1466, 1473 (2005). Defendant does not argue it satisfies all of these requirements, nor could it argue such in good faith.

party to intercept usage data paired with personally identifiable information. FAC ¶ 41. As the Complaint alleges, "[b]y warranting as much, Defendant has failed to receive consent from visitors to intercept their communications." FAC ¶ 42.

## II. FACEBOOK IS NOT A PARTY TO THE INTERCEPTED COMMUNICATIONS

Quest ignores several important facts while arguing that Plaintiffs' California Invasion of Privacy ("CIPA") claim should be dismissed because, according to Quest, Facebook was a party to the communications at issue. MTD at 24. First, Facebook was not an intended recipient of the communications and Quest cannot point to a single allegation to the contrary. Second, the plain language of CIPA does not contain a direct communication exemption, unlike the Electronic Communications Privacy Act ("ECPA"). Third, Quest ignores the simple fact that each intercepted communication began with a single click of a button on Plaintiffs' mouse or keyboard or screen, causing a single signal to travel from Plaintiffs' device through their browsers to Quest's servers. FAC ¶ 17. Even if Quest's assertion that a separate parallel communication sent to Facebook's server is material (it is not), that parallel communication occurred after the initiation by Plaintiffs' click. As recognized by the Northern District of California, "it cannot be that anyone who receives a direct signal escapes liability by becoming a party to the communication. Someone who presses up against a door to listen to a conversation is no less an eavesdropper just because the sound waves from the next room reach his ears directly. That person remains a third party, even as a direct recipient of the speaker's communication." *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, *2 (N.D. Cal. Oct. 23, 2019).

Quest places outsized reliance on *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F. 3d 125 (3d Cir. 2015) ("*Google Cookie Placement*"), ignoring the important and distinguishing fact that, in that case, the defendant (Google) was already receiving communications from the viewed website in the ordinary course ***without*** the problematic cookies

being challenged by plaintiffs in that case. *Id.* at 142.[4] Indeed, for the viewed website to load, a GET request was sent to Google to retrieve advertisements to display as part of the content of the website. *Id.* at 141. The Third Circuit found that as Google was already receiving communications from the website in order to retrieve ads from its network to display on the viewed page, *i.e.*, it was an intended recipient, the addition of identifying information from the allegedly unlawful cookie in that same request did not give rise to the wiretap claim. *Id.* at 143.[5] Contrary to Quest's arguments here, simply being the recipient of a GET request *does not* make an interloping entity a party to a private communication under *Google Cookie Placement*, rather, it must be an *intended* recipient in the ordinary course of operation to be a party.

Of particular note, the Third Circuit in *Google Cookie Placement* discussed a problematic hypothetical (distinct from the allegations in that case) wherein a device would be "capable of capturing communications sent by the plaintiffs and intended for first-party websites, and then transmitting them to the defendants." *Id.* at 141. Here, the hypothetical has come to fruition, as the Pixel is the "device" that captures communications sent by Plaintiffs to Quest's website and then transmits the communications to Facebook, an unintended recipient. Facebook does not receive GET requests from Quest's website in the ordinary course of the website's operation, but

[4] *See Google Cookie Placement*, 806 F.3d at 142 ("The information at issue would be sent anyway because 'the user's web browser send[s] a GET request to Google to display the relevant advertising information for the space on the page for which Google has agreed to sell display advertisements.'").

[5] Defendant omits the important distinction that Google was already contacted for its ad network separate and apart from the challenged conduct, removing 2 pages of the Third Circuit's discussion with a simple ellipsis in the middle of a block quotation. *See* MTD at 26. For example, the next sentences omitted by ellipsis state, "After all, the defendants would have the information at issue anyway. Underscoring that there are direct transmissions between the plaintiffs and the defendants, the complaint notes that the defendants place cookies on web browsers 'in the process of injecting the advertisements,' which are 'serve[d] ... directly from the third-party company's servers rather than going through the individual website's server." *Google Cookie Placement*, 806 F. 3d at 140.

rather it only receives GET requests when Plaintiffs are communicating with the Quest website through their actions.

The Third Circuit's recent decision evaluating wiretapping claims, *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022), similarly found that "[t]hus [the third party] and [defendant] cannot avoid liability merely by showing that [plaintiff] unknowingly communicated directly with [third-party] servers." *Id.* at 129. While *Popa*'s evaluation was limited to Pennsylvania's Wiretapping and Electronic Surveillance Act ("WESCA"), the Third Circuit looked to the statutory text and found that prior decisions such as *Google Cookie Placement* were distinguishable as "the Federal Wiretap Act—unlike the WESCA—has an explicit direct-party exemption. *See* 18 U.S.C. § 2511(2)(d). So we reached a different conclusion . . . by applying that exemption." *Id.* at 129 n. 6. CIPA, like WESCA, lacks an explicit direct-party exemption in its statutory text and thus courts in the Northern District of California have allowed CIPA claims to proceed directly against Facebook for the conduct similar to that alleged here. *See, e.g.*, *Doe v. Meta Platforms*, 2023 WL 5837443, *7 (N.D. Cal. Sept. 7, 2023) ("Meta's motion to dismiss the CIPA claim is DENIED.").[6]

Contrary to Defendant's omissive argument, the Third Circuit's decision in *Google Cookie Placement* does not alter the analysis of CIPA. Instead, it demonstrates that Plaintiffs have alleged a valid CIPA claim against Quest for aiding the transmission of this private information to Facebook.

---

[6] While *Google Cookie Placement* affirmed the dismissal of CIPA claims under the factually distinct circumstances of that case, *Popa*'s statutory analysis calls into question whether that conclusion would still be reached, particularly as the Third Circuit in *Google Cookie Placement* called for further development of CIPA law, which has since happened. *See* 806 F.3d at 152 n.137 ("Google may be liable under Section 631(a) for recording the communications and sharing them with third parties. Judge Fisher does not write separately as it does not appear that California law is developed sufficiently on this question to reverse the judgment of the District Court.").

## III. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANT ASSISTED FACEBOOK WITH INTERCEPTING THE "CONTENTS" OF THEIR COMMUNICATIONS

Defendant contends that Plaintiffs' wiretapping claims fail "because they did not . . . plausibly allege that Facebook learned the 'contents' of any of Plaintiffs' internet communications with Quest's website." MTD at 27. But Defendant ignores that full-string URLs described in the FAC—the information Plaintiffs allege Defendant helped Facebook learn—contain user-entered and user-specific information that constitutes content, particularly when coupled with microdata that includes the text, titles, headers, images, image captions, links, and other information located on the webpage. *See* FAC ¶¶ 16-17 29, 19-40.

CIPA prohibits any person or entity from "aid[ing], agree[ing] with, employ[ing], or conspir[ing]" with a third party to "learn the contents or meaning" of a "communication" without consent. *See* Cal. Pen. Code § 631(a). "[T]he term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014).[7] Record information and content, however, "are not mutually exclusive categories." *Google Cookie Placement*, 806 F.3d at 139. "For instance, contact information provided as part of a sign-up process constitutes 'content' because this information is the subject of the communication." *In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *11.

Plaintiffs plausibly allege that Defendant assisted Facebook with learning the content of

---

[7] *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *15 (D.N.J. July 2, 2014), which Defendant relies on (MTD at 28-29), merely reiterates this holding and reaffirms the *Zynga* court's observation that "[u]nder some circumstances, a user's request to a search engine for specific information could constitute a communication such that divulging that search term to a third party could result in disclosure of contents." (internal quotations omitted).

their communications. Plaintiffs allege that they accessed both the General Website and the Patient-Protected Website. *See* FAC ¶¶ 4-5. For the General Website, Defendant "transmitted PageView, Microdata, and ButtonClick data," which sent "the URL of the page requested, along with the title of the page, keywords associated with the page, and a description of the page." *See id.* ¶¶ 28-29. For the Patient-Protected Website, Defendant "transmit[t]ed PageView information," which sent "the URL accessed," allowing Facebook to know "that a patient ha[d] received and [was] accessing test results." *Id.* ¶¶ 24-26. Figures 5 and 6 exemplify the point, displaying the types of URLs that Facebook obtained. *See id.* ¶ 24.[8]

As the exemplars make clear, Defendant structured the post-domain portions of the URLs—everything after ".com"—to disclose details about the webpage requested, and thus by helping Facebook learn that information, Defendant helped Facebook learn the content of Plaintiffs' communications. *See Google Cookie Placement*, 806 F.3d at 139 ("[T]he domain name portion of the URL—everything before the '.com'—instructs a centralized web server to direct the user to a particular website, but post-domain name portions of the URL are designed to communicate to the visited website which webpage content to send the user."); *see also In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) (finding that "content categories of the site or app," along with other types of information, "fall[s] within the definition of content"); *In re Vizio, Inc. Consumer Priv. Litig.*, 2017 WL 11420284, at *6 (C.D. Cal. July 25, 2017) ("[N]othing in *In re Zynga Privacy Litigation* suggests that the standard for determining whether information qualifies as record or content data depends on how much content is collected or whether the intercepted information would be recognizable.") (internal quotations

[8] For the General Website: https://www.questdiagnostics.com/healthcare-professionals/about-our-tests/allergy-asthma. For the Patient-Protected Website: https://myquest.questdiagnostics.com/results/4jkE3XHNNBR97gS1XIO_-O%3D%3D/prsId/FzMFvzrjkM4cUzKprO%3d%3D

omitted).

*In re Meta Pixel Healthcare Litig.* is instructive. There, "four Facebook users" brought wiretapping claims against Meta Platforms, Inc., alleging their healthcare providers "installed the Meta Pixel on their patient portals." 2022 WL 17869218, at *1. Based on these allegations, the plaintiffs sought a preliminary injunction against Meta, thereby requiring the court to evaluate whether the law and facts "clearly favor[ed]" their position. *Id.* Meta asserted that "the names of buttons clicked on websites and their associated URLs are not 'content' within the meaning of the statute," *see id.* at *11, but the court "disagree[d]," observing that "the transmitted URLs include both the 'path' and 'query string,'" and holding that "[t]hese items are content because they concern the substance of a communication." *Id.* Indeed, the court specifically identified the following URL as constituting "content" under CIPA: hardfordhospital.org/services/digestive-health/conditions-we-treat/colorectal-small-bowel-disorders/ulcerative-colitis. *Id.* And the court found information regarding "log-in button" clicks were similarly descriptive in part because it "sufficiently identifies the website user as a patient." *Id.* at *8, *11.

So too here. Because Defendant revealed the same type of information as the healthcare providers in *In re Meta Pixel Healthcare Litigation*, the same result should be reached. *See also In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 at 605 (9th Cir. Apr. 9, 2020) (finding that Facebook intercepted the content of the plaintiffs' communications by "collect[ing] a full-string detailed URL, which contains the name of a website, folder and sub-folders on the web-server, and the name of the precise file requested"); *Katz-Lacabe v. Oracle America, Inc.*, 2023 WL 2838118 at *15 (N.D. Cal. Apr. 6, 2023) (holding that "referrer URLs" constitute content).

Defendant relies on *Hammerling v. Google LLC*, 2022 WL 2812188 (N.D. Cal. July 18, 2022), but that case is entirely inapposite. MTD at 16-17. There, the plaintiffs argued that Google

wiretapped their communications by "secretly us[ing] their Android smartphones to collect data about non-installation metrics, the amount of time spent using the non-Google apps, and how often those apps were opened." *Id.* at *1. As the court properly recognized, those allegations only amounted to generalized "usage and engagement data," *see id.*, and unlike the URLs (and related microdata and button click data) at issue here, that data failed to reveal "the specific information (i.e., content) that a user input[ted]." *Id.* at *14; *see also In re Meta Pixel Healthcare Litig.*, 2022 WL 17869218, at *16 n.13 (observing that "the kind of data collected in *Hammerling* is not analogous to the data at issue here"). *Hammerling* is therefore inapposite.

## IV. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANT DISCLOSED PROTECTED MEDICAL INFORMATION

The CMIA states that a "provider of health care . . . shall not disclose medical information regarding a patient of the provider of health care . . . without first obtaining an authorization . . ." Cal. Civ. Code § 56.10(a). "'Medical information' means any individually identifiable information, in electronic or physical form, in possession of or derived from a provider of health care . . . regarding a patient's medical history, mental health application information, mental or physical condition, or treatment." Cal. Civ. Code § 56.05(i). "'Individually identifiable' means that the medical information includes or contains any element of personal identifying information sufficient to allow identification of the individual, such as the patient's name, address, electronic mail address, telephone number, or social security number, or other information that, alone or in combination with other publicly available information, reveals the identity of the individual." *Id.*

Here, Defendant has unlawfully disclosed Plaintiffs' medical information to third parties (*i.e.* Facebook) in violation of the CMIA. Specifically, Plaintiffs allege that "Defendant aids, employs, agrees with, and conspires with Facebook to eavesdrop on communications sent and received by Plaintiffs and Class members, ***including communications containing protected***

***medical information***." FAC ¶ 3 (emphasis added). The specific medical information disclosed by Defendant to Facebook is protected medical information regarding Plaintiffs' medical tests, which Plaintiffs accessed through Defendant's Patient-Protected Website. *See* FAC ¶ 26 ("For the Patient-Protected Website, PageView discloses information 'regarding a patient's medical history, mental or physical condition, or treatment' because it transmits information showing, at a minimum, that a patient has received and is accessing test results."); *id.* ¶ 29 ("Quest Diagnostics transmitted PageView, Microdata and Button Click data so Facebook could learn the contents and meaning of a user's electronic communication.").

This unlawfully disclosed medical information also individually identified Plaintiffs. *See id.* ¶ 30 ("Defendant's Pixels also intercept and collect personally identifiable information."); *id.* ¶ 31 ("A user who accesses either website [(*i.e.* the General Website or the Patient-Protected Website)] while logged into Facebook[9] will transmit the c_user cookie to Facebook, which contains that user's unencrypted Facebook ID[10]."). In short, Defendant disclosed medical information related to medical tests Plaintiffs underwent through Defendant (substantive medical information), which was individually identifiable because the information related to the medical tests was linked to Plaintiffs' Facebook IDs. *See id.* ¶ 68 ("Defendant's Pixel disclosed medical information because it transmitted a patient's Facebook ID and other Facebook identifiers, which constitutes individually identifiable information, alongside event data that disclosed the URL of the webpage a patient accessed to review test results. By doing so, Defendant disclosed

---

[9] Both Plaintiffs allege that they typically remain logged into Facebook when accessing their accounts from Defendant, (FAC ¶¶ 4-5), meaning their unencrypted Facebook ID was transmitted to Facebook when they accessed the General Website or the Patient-Protected Website.

[10] Plaintiffs' Facebook IDs individually identify Plaintiffs because Facebook is a "'real identity platform,' meaning users are allowed only one account and must share 'the name they go by in everyday life.' To that end, when creating an account, users must provide their first and last name, along with their birthday and gender." FAC ¶ 10.

individually identifiable information regarding a patient's medical history, mental or physical condition, or treatment.").

Courts have held that a disclosure of "specimen or test information" is sufficient to meet the requirement of "substantive" medical information, as set forth in *Eisenhower Medical Center v. Superior Court,* 226 Cal. App. 4th 430 (2014). *See, e.g.*, *Tamraz v. Bakotic Pathology Assocs., LLC*, 2022 WL 16985001, at *5 (S.D. Cal. Nov. 16, 2022) ("Drawing reasonable inferences in favor of the non-moving party, the Court finds that 'specimen or test information' is 'medical information' under the CMIA. Therefore, Plaintiff adequately alleges the data breach included 'medical information' under the CMIA.").

Defendant argues that disclosure of the URL of the Patient-Protected Website where Plaintiffs navigated to view their test results is not "medical information." MTD at 20 n.17. However, Defendant's argument is wrong and cannot be reconciled with *Tamraz*. By disclosing URL information, such as myquest.questdiagnostics.com/results/, Defendant is disclosing to Facebook, at minimum, that Plaintiffs received and are accessing test results. FAC ¶ 26. This is undoubtedly "test information" as set forth in *Tamraz*.

Defendant continues that "even assuming 'the URL of the webpage a patient accessed to review test results' was disclosed, . . . it is not materially different than the information disclosed in *Eisenhower*[.]" MTD at 33. That is wrong. *Eisenhower* involved a stolen computer from a medical facility that contained individually identifiable data but no medical information. The *Eisenhower* court explained that "[i]nformation about an individual's medical history, condition, or treatment is saved only on [the defendant's] servers located in the data center. The index that was on the stolen computer is a subset of information from its master patient index and can be used in case of a power outage or network failure to look up the patient's MRN so that a hard copy of

the medical records can be located. The MRN is sequential and contains no coded information." *Eisenhower*, 226 Cal. App. 4th at 432-33. Therefore, in *Eisenhower*, there was no way that the third party could discern any medical information through the stolen computer. Here, by contrast, the information disclosed by Defendant to Facebook contains medical information in the form of "test information," as described above. The nexus of the "test information" is the exact fact that the *Tamraz* court used to distinguish that case from *Eisenhower*. The *Tamraz* court explained: "As Plaintiff points out in his Opposition, disclosure of the 'specimen or test information' in this instant case distinguishes it from the precedents cited in Defendants' briefing" (i.e. *Eisenhower*). *Tamraz*, 2022 WL 16985001, at *5.

Defendant next argues that "Plaintiffs do not plausibly allege facts indicating that any of their individually identifiable information was actually disclosed." MTD at 34. That is also wrong. Plaintiffs allege that they typically remain logged into Facebook on their "devices" when accessing their accounts from Defendant, (FAC ¶¶ 4-5), meaning their unencrypted Facebook ID was transmitted to Facebook when they accessed their account through Defendant's websites. Defendant raises speculative arguments, including that Plaintiffs do not allege "whether they visited Quest's websites using the same browser or device they used to visit Facebook, or whether they cleared cookies." MTD at 21. Defendant's argument is counterfactual because Plaintiffs specifically allege that they remain logged in to Facebook on their "devices" after accessing their accounts, meaning that Plaintiffs are logged into Facebook on their internet connected devices that they also used to navigate to Defendant's websites. FAC ¶¶ 4-5. Plaintiffs also do not allege that they cleared cookies, and any supposition to the contrary by Defendant is not based in fact. In short, Plaintiffs plausibly allege that they navigated to Defendant's websites from internet connected devices that were simultaneously logged in to Facebook, which, according to the factual

allegations in the FAC, transmitted protected medical information that individually identified Plaintiffs from Defendant to Facebook, thereby constituting a violation of the CMIA.

Finally, Defendant argues that "Plaintiffs allege that Quest removed the Pixel from MyQuest 'sometime after December 2021,' and Plaintiff Roche's visit to MyQuest allegedly occurred in March 2022. . . . These allegations suggest that Plaintiff Roche's personal identifying information was *not* shared." MTD at 35. That makes no sense. March 2022 is "sometime after December 2021," so it cannot be concluded that Plaintiff Roche's information was not shared just because she visited Defendant's website in March 2022. Whether or not the Pixel was active at the time of Plaintiff Roche's visit to Defendant's website in March 2022 is ultimately a factual question to be determined through discovery.

In sum, Plaintiffs plausibly state a claim for violation of the CMIA, and Defendant's motion to dismiss Plaintiffs' CMIA claim should be denied.

## V. PLAINTIFFS ADEQUATELY ALLEGE THAT DEFENDANT IS THE DISCLOSING PARTY

Defendant's final argument—that the FAC fails to allege facts "suggesting that Quest ever disclosed or used" medical information—rests on a misreading of the FAC and should be rejected. MTD at 36.

Section 56.10(a) prohibits a health care provider from improperly "disclosing" medical information. Cal. Civ. Code § 56.10(a). Section 56.10(d) similarly prohibits a health care provider from "sharing" or "using" such information without consent. Cal. Civ. Code § 56.10(d).[11]

[11] The cases cited by Defendant hold only that the prohibitions on disclosure and sharing require an "affirmative communicative act." *See Regents of Univ. of Cal. v. Superior Court*, 220 Cal. App. 4th 549, 564 (2013); *Stasi v. Inmediata Health Grp. Corp.*, 501 F. Supp. 3d 898, 922 (S.D. Cal. 2020). Section 56.10(d)'s independent prohibition on the "use [of] medical information for a purpose not necessary to provide health care services to the patient" contains no requirement of a communicative act.

Plaintiffs adequately allege both disclosure and use. To be sure, while Plaintiffs contend that Defendant "aided and abetted" Facebook's unlawful interception of medical information in violation of CIPA, Plaintiffs also allege Defendant's direct participation in violation of CMIA—that is, Defendant disclosed and used medical information for marketing purposes. These legal theories are not mutually exclusive.

As explained above, Plaintiffs allege that Defendant embedded the Pixel into its website source code. FAC ¶¶ 16, 23. The Pixel is based on open-source code created by Facebook, (MTD at 22), but is also under Defendant's control by virtue of Defendant's decision to integrate the code. *Id.* ¶ 16 ("Facebook offers this piece of code to advertisers, like Quest Diagnostics, to integrate into their website."). In practice, the Pixel "tracks the people and type of actions they take." *Id.* The Pixel "surreptitiously directs the user's browser to send a separate message to Facebook's servers" containing protected information. *Id.* ¶¶ 16-17; *see also id.* ¶¶ 24, 67-68 ("Defendant's Pixels intercept and transmit PageView information."). When users "click on links . . . *Defendant* will send the URL of the page requested, along with the title of the page, keywords associated with the page, and a description of the page." *Id.* ¶ 28; *see also id.* ¶ 29 ("Quest Diagnostics transmitted PageView, Microdata and Button Click data so Facebook could learn the contents and meaning of a user's electronic communication.").

Moreover, Defendant's Pixel discloses information "regarding a patient's medical history, mental or physical condition, or treatment" because it transmits information showing, at a minimum, that a patient has received and is accessing test results. *Id.* ¶ 28. Defendant's Pixel also "transmit[s] the c_user cookie to Facebook, which contains that user's unencrypted Facebook

ID"—information that personally identifies each patient by name. *Id.* ¶ 31.[12] Importantly, Facebook would not have received this information but for Defendant's decision to use the Pixel and integrate it into its source code. Unlike past Facebook Business Tools—such as the Facebook Like Button that was largely controlled and maintained by Facebook rather than third-party websites—Defendant controlled every aspect of the Pixel, was responsible for determining which of its webpages contained the Pixel, and also decided which types of information were tracked and transmitted to Facebook via the Pixel. *Id.* ¶¶ 14-17, 23-31; *see Belozerov v. Gannett Co., Inc.*, 2022 WL 17832185 (D. Mass. Dec. 20, 2022) (rejecting the argument that the defendant "did not actually 'disclose' any PII to Facebook," reasoning that the defendant "placed the tracking pixel on the USA Today website"); *Czarnionka v. Epoch Times Ass'n*, 2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) (explaining that "Defendant's installation of the Pixel exposed its subscribers' information to Facebook," and holding that "[t]his is sufficient to constitute 'disclosure' under the VPPA").

These allegations must be accepted as true on a 12(b)(6) motion. Thus, Plaintiffs adequately allege Defendant engaged in an "affirmative communicative act" under CMIA via the Pixel—i.e., directing users' browsers to transmit Facebook IDs alongside event data regarding medical history, mental or physical condition, or treatment. *Id.* ¶ 66. And Defendant is liable for "using" this patient information for marketing purposes—a rational inference as Defendant had no reason to embed the Pixel beyond targeted advertising. *Id.* ¶ 40 (Quest uses Pixel data to "retarget patients on Facebook").

---

[12] In addition to data transmission sent via the website visitors' browsers, Plaintiffs are informed and believe Defendant conducts server-to-server data transmissions wherein Defendant's server sent information about its website visitors communications directly to Facebook's server. *See* FAC ¶ 14.

## VI. THE CHOICE OF LAW CLAUSES ARE INAPPLICABLE TO PLAINTIFFS' CLAIMS

Quest includes the confusing argument at the end of its brief that Plaintiffs' CIPA and CMIA claims must be dismissed because they arise under California law and Quest maintains that all of Plaintiffs' claims are governed by New Jersey law due to choice of law provisions. MTD at 37. This is confusing because Quest's brief predominantly relies on and cites to California law, Ninth Circuit law, and numerous district court decisions from around the country. *See id.* at 27-28, 31, 35. If the choice of law provisions were truly determinative of Plaintiffs' claims as asserted in the throwaway arguments, this would be a threshold issue to be determined before any other analysis—not an argument to address after discussing the merits of the claims.

Setting aside the questionable optics of Quest's choice of law argument, it fares no better on substance. First, as discussed above, at the motion to dismiss stage the court must only consider the four corners of the Complaint, which contains no reference to the agreements that Quest seeks to rely on here. *See, e.g.*, *Pistone v. Rushmore Serv. Ctr., LLC*, 2022 WL 16834672, at *2 (D.N.J. Nov. 9, 2022) ("[T]he existence of the Card Agreement and its arbitration provision and class-action waiver is not referenced in the Complaint but is raised for the first time in Defendant's motion. . . . Given that the question of arbitrability cannot be resolved without considering evidence extraneous to the pleadings, it would be inappropriate to apply a Rule 12(b)(6) standard in deciding the instant motion.").

Second, even if it were proper to consider these provisions, courts considering similar terms have held that they do not encompass tort claims like those asserted here which are separate and untethered from the agreement at issue. *See, e.g.*, *Balanzar v. Fid. Brokerage Servs., LLC*, 654 F. Supp. 3d 1075, 1080-81 (S.D. Cal. 2023) ("The fact that the CIPA cause of action loosely relates

to the customer account agreement because the MyVoice technology is simply mentioned in the agreement is not enough. Plaintiff's CIPA claim is not brought pursuant to contract law and is not sufficiently related to the customer account agreement. Thus, the Court finds the Massachusetts law does not apply."); *Clark-Alonso v. Sw. Airlines Co.*, 440 F. Supp. 3d 1089, 1095 (N.D. Cal. 2020) ("Defendant is essentially arguing that but for plaintiff's membership in the Rapid Rewards program, he would not have called the Rapid Rewards phone number. The Court finds that this connection is too attenuated to support a conclusion that plaintiff's CIPA claim 'relates to' the Rapid Rewards Rules and Regulations."). Plaintiffs' claims, like those at issue in *Balanzar*, are not brought pursuant to contract law and do not require analysis of the terms and conditions that contain the choice of law clauses Quest seeks to enforce here.

Third, Defendant's assertion that it is able to prevent California residents from effectuating their statutorily granted rights through a non-negotiable adhesion contract would be an improper and unconscionable prospective waiver of their statutory rights. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 241 (3d Cir. 2020) (finding a contractual requirement to arbitrate under tribal law, and thus waive claims based on other laws, to violate public policy and render the arbitration agreement unenforceable as a "a party may not underhandedly convert a choice of law clause into a choice of no law clause") (quoting *Hayes v. Delbert Servs. Corp.,* 811 F. 3d 666, 675 (4th Cir. 2016)).

At bottom, Plaintiffs are California residents who brought claims in California pursuant to California statutes that require businesses receiving California citizen's information to not share their sensitive information without informed consent. Indeed, CIPA's statutory purpose underscores that this statute was intended to protect California's citizens from invasions of their privacy such as the unlawful conduct alleged here:

> [A]dvances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society.

Cal. Pen. Code. § 630. Even if the Court were to engage in Defendant's conflicts of law analysis, (it need not), California unquestionably has a materially greater interest in the claims of its citizens, like Plaintiffs, than New Jersey. *See, e.g.*, *Erceg v. LendingClub Corp.*, 475 F. Supp. 3d 1071, 1078 (N.D. Cal. 2020) ("[B]ecause Plaintiff is a resident of California, California has a greater interest in applying its privacy laws to protect the citizens of its states than Massachusetts does in applying its privacy laws to protect the citizens of a different state."); *In re Yahoo Mail Litig.*, 308 F.R.D. 577, 603 (N.D. Cal. 2015) ("Here, the Court agrees with Plaintiffs that California has an interest in applying its own privacy laws to communications and putative class members within California, as well as to entities operating within California.").[13] Indeed, California places the privacy of its citizens, and digital privacy in particular, at the forefront of its policy interests being the first state in the nation to enact substantive privacy statutes like the California Consumer Privacy Act ("CCPA") as well as the California Privacy Rights Act ("CPRA"), which created the California Privacy Protection Agency, "the first agency in the country dedicated to protecting forty million Californians' fundamental privacy rights."[14]

The Court should reject Quest's last-ditch effort to avoid liability by invoking a generic choice of law agreement that is unrelated to these claims and fails even under its own choice-of-

[13] *See also Delgado v. Meta Platforms*, 2024 WL 818344, **3-5 (N.D. Cal. Feb. 27, 2024), rejecting application of contractual choice of law provision that would be contrary to the fundamental policy of a state by foreclosing its citizen's state law privacy claims.

[14] Office of the California Attorney General, *California Officials Announce California Privacy Protection Agency Board Appointments,* https://oag.ca.gov/news/press-releases/california-officials-announce-california-privacy-protection-agency-bo-ard.

law analysis.

## VII. ANY DISMISSAL SHOULD BE WITH LEAVE TO AMEND

If a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the Court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Indeed, the Third Circuit has instructed that "'[i]f a complaint is vulnerable to Rule 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile.'" *Riley v. Timmons Constr. LLC*, 2022 WL 597356, at *6 (W.D. Pa. Feb. 28, 2022) (quoting *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008)); *see also Hunter v. Dematic USA*, 2016 WL 2904955, at *3 (D.N.J. May 18, 2016) ("Leave to amend a complaint should be granted freely in the absence of undue delay or bad faith on the part of the movant as long as the amendment would not be futile and the opposing party would not suffer undue prejudice.").

Plaintiffs respectfully request that Defendant's motion be denied. Despite the low standard on a Rule 12(b)(6) motion, if the Court deems any of the claims inadequately pleaded, Plaintiffs can cure any deficiencies by further amendment. There has been no prior judicial evaluation of the pleadings and Defendant cannot demonstrate bad faith, dilatory motive, or prejudice.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be denied in its entirety.

Dated: March 11, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*

Philip L. Fraietta

1330 Avenue of the Americas
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

**CARELLA BYRNE CECCHI BRODY & AGNELLO, P.C.**
James E. Cecchi
Kevin G. Cooper
5 Becker Farm Rd.
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
Email: jcecchi@carellabyrne.com
kcooper@carellabyrne.com

*Attorneys for Plaintiffs*