**FAEGRE DRINKER BIDDLE & REATH LLP**
Matthew J. Fedor
600 Campus Drive
Florham Park, New Jersey 07932
(973) 549-7000
(973) 360-9831 (fax)
Matthew.Fedor@faegredrinker.com

Zoë K. Wilhelm
1800 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 203-4000
(310) 229-1285 (fax)
Zoe.Wilhelm@faegredrinker.com

*Attorneys for Defendant*
*Quest Diagnostics Incorporated*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| ANGELA COLE and BEATRICE ROCHE, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>QUEST DIAGNOSTICS, INC.,<br><br>Defendant. | Case No. 2:23-cv-20647-WJM-JSA<br><br>Civil Action<br><br>(Document Filed Electronically)<br><br>**Motion Day**: April 1, 2024<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF ITS**
**MOTION TO DISMISS PLAINTIFFS'**
**FIRST AMENDED CLASS ACTION COMPLAINT**

# **TABLE OF CONTENTS**

                                                                                                                         **Page**

PRELIMINARY STATEMENT ...................................................................................1

ARGUMENT .................................................................................................................1

    I.     Plaintiffs Have Not Plausibly Alleged Lack of Consent........................1

          A.    Lack of consent is an element of Plaintiffs' claims, not a defense.....................................................................................1

          B.    Quest's Cookie Notice discloses the practices Plaintiffs challenge here, as Judge Thurston already found. .....................2

          C.    Plaintiffs' agreement to Facebook's policies is relevant. ...........4

    II.    Plaintiffs Ignore Their Own Allegations Confirming That Facebook Was a "Party" to the Communications At Issue Under Third Circuit Law. ........................................................................6

    III.   Plaintiffs Have Not Alleged an Interception of Communication "Contents." ................................................................................................8

    IV.   Plaintiffs Did Not Plausibly Allege Disclosure of "Medical Information." ..........................................................................................11

    V.    Plaintiffs Have Not Plausibly Alleged That Quest Was the Disclosing Party. ...................................................................................12

    VI.   Plaintiffs' Choice of Law Argument Fails. .........................................14

CONCLUSION............................................................................................................15

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                                  **Page(s)**

*Belozerov v. Gannett Co.*,
   2022 WL 17832185 (D. Mass. Dec. 20, 2022) ...................................................13

*Buck v. Hampton Twp. Sch. Dist.*,
   452 F.3d 256 (3d Cir. 2006) ..............................................................................14

*Cole v. Quest Diagnostics, Inc.*,
   2023 WL 6201702 (E.D. Cal. Sept. 22, 2023) ........................................3, 14, 15

*Eisenhower Med. Ctr. v. Superior Court*,
   226 Cal. App. 4th 430 (Cal. Ct. App. 2014) .......................................................11

*In re Facebook, Inc. Internet Tracking Litig.*,
   956 F.3d 589 (9th Cir. 2020) ................................................................................8

*In re Google Assistant Priv. Litig.*,
   457 F. Supp. 3d 797 (N.D. Cal. 2020) .................................................................2

*In re Google Inc. Cookie Placement Consumer Priv. Litig.*,
   806 F.3d 125 (3d Cir. 2015) .....................................................................6, 7, 8, 9

*Halprin v. Verizon Wireless Servs., LLC*,
   2008 WL 961239 (D.N.J. Apr. 8, 2008) ............................................................15

*In re Meta Pixel Healthcare Litig.*,
   647 F. Supp. 3d 778 (N.D. Cal. 2022) .......................................................5, 6, 10

*Moledina v. Marriot Int'l*,
   635 F. Supp. 3d 941 (C.D. Cal. 2022) .................................................................2

*Phillips v. Cnty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008) ...........................................................................1, 12

*Popa v. Harriet Carter Gifts, Inc.*,
   52 F.4th 121 (3d Cir. 2022) ..................................................................................8

*Silver v. Stripe Inc.*,
   2021 WL 3191752 (N.D. Cal. July 28, 2021) ......................................................2

*Smith v. Facebook, Inc.*,
　262 F. Supp. 3d 943 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th
　Cir. 2018) ...................................................................................................................5

*Sutter Health v. Superior Court*,
　227 Cal. App. 4th 1546 (Cal. Ct. App. 2014) ......................................................13

*Tamraz v. Bakotic Pathology Assocs., LLC*,
　2022 WL 16985001 (S.D. Cal. Nov. 16, 2022) ....................................................11

*Williams v. Medley Opportunity Fund II, LP*,
　965 F.3d 229 (3d Cir. 2020) .................................................................................15

*In re Zynga Priv. Litig.*,
　750 F.3d 1098 (9th Cir. 2014) .................................................................... 8, 9, 10

**Statutes, Rules & Regulations**

Cal. Civ. Code § 56.05(j) ...........................................................................................12

**Other Authorities**

https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-
　online-tracking/index.html (last visited Mar. 20, 2024) .........................................6

# PRELIMINARY STATEMENT

There is not a single factual allegation in the FAC stating that Quest disclosed actual medical conditions, specific diagnostic tests taken, or test results. Nor is there a single factual allegation in the FAC stating that Facebook learned this information. The closest Plaintiffs come is the allegation that information disclosed shows a user "has received and is accessing test results" for unidentified tests—which is *not* "medical information" under CMIA. Instead of identifying allegations to support their claims, Plaintiffs resort to scare tactics—such as speculating that the website analytics data "may" reveal that a patient viewed a "hepatitis positive test result"—which is not alleged *anywhere* in the FAC. But this Court may not rely on appeals to emotion, speculation, or surmise. Rather, the Court's task is to determine if there are "enough facts" alleged to "nudge" Plaintiffs' CIPA and CMIA "claims across the line from conceivable to plausible." *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (cleaned up). There are not, as shown in Quest's moving brief and as explained further below.

# ARGUMENT

**I.    Plaintiffs Have Not Plausibly Alleged Lack of Consent.**

**A.    Lack of consent is an element of Plaintiffs' claims, not a defense.**

Initially, Plaintiffs' argument that consent is an affirmative defense is wrong as a matter of law. The plain language of CIPA and CMIA make clear that a plaintiff must show lack of consent/authorization to prove a statutory violation. *See*

Moving Br. at 19-20. Case law supports this. *See, e.g.*, *Moledina v. Marriot Int'l*, 635 F. Supp. 3d 941, 952 (C.D. Cal. 2022) ("Consent is an express element of a claim under [CIPA]"). And courts often grant motions to dismiss for failure to plausibly allege lack of consent. *See, e.g.*, *Silver v. Stripe Inc.*, 2021 WL 3191752, at \*2-5 (N.D. Cal. July 28, 2021) (dismissing CIPA claims).

Plaintiffs rely on *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797 (N.D. Cal. 2020), but that case proves Quest's point. The language Plaintiffs quote discusses consent for a Stored Communications Act ("SCA") claim. *Id*. at 823. The court recognized that, "whereas consent is a defense under the SCA," a "plaintiff bringing a CIPA claim has the burden to prove that the defendant lacked consent." *Id*. at 828. And the court found that the "allegation that the recordings 'were made without Plaintiffs' consent' is conclusory." *Id*. Plaintiffs' allegations about consent here are indistinguishable from the deficient allegations in *Google Assistant*.

### B. Quest's Cookie Notice discloses the practices Plaintiffs challenge here, as Judge Thurston already found.

In an effort to sidestep the consent issue, Plaintiffs cherry-pick language from the Cookie Notice and suggest it amounts to a promise that Quest would not allow use of any cookies that collect usage data that potentially can be associated to website visitors and used for targeted marketing. Opp. at 6-7. This argument lacks merit and ignores that Judge Thurston already found that the MyQuest Account "Terms and Conditions disclose the data collection practices challenged

2

and referenced by Plaintiffs." *Cole v. Quest Diagnostics, Inc.*, 2023 WL 6201702, at *3-4 (E.D. Cal. Sept. 22, 2023). Indeed, the Cookie Notice must be read as a whole—as Judge Thurston did—not in isolated parts as Plaintiffs urge.  *See id.*

The gist of Plaintiffs' claim is that Quest used the Pixel so it could later retarget website visitors with ads on Facebook. The Cookie Notice discloses that website visitors may indeed receive targeted ads on *other* platforms (like Facebook) based on their browsing history and activity *on Quest's websites*:

- Targeting cookies "are **used to deliver online advertisements** both on and **off websites** visited that may be more relevant to visitor interests **based on activity from a website being browsed and based on a profile built of visitor interests**."

- "[W]e do set targeting cookies on our sites to help us **promote Quest's products and services to you on other sites and platforms. We also allow third parties to place cookies on our websites, and information collected via these cookies is used to provide you with information** that may be of interest to you **based on your activities on our websites.** These targeting cookies do not directly store personal information (such as names or email addresses), **but store unique identifiers that identify to us and our partners a particular visitor's browser and/or device."**

- "Some cookies can **collect personal information**, including information you disclose like your **username**, or **other identifiers that are collected together with your browsing history and activity, to deliver more relevant advertising content**."

- **"[T]hird-party cookies, are placed on your computer when you visit our websites,** but are stored by other service providers or third party domains."
*See* Hausmann Decl., Ex. D (ECF No. 51-3) (emphases added).

3

Additionally, the only cookies that contain supposed personal identifiers (in the form of a Facebook ID) are the c_user and fr cookies. FAC ¶¶ 31-33, 39. Quest discloses that these third-party cookies are set and controlled *by Facebook* and subject to *Facebook's* privacy policies. While Quest notifies users that it does not "directly store personal information" in the targeting cookies it controls, Quest also explains it "do[es] not control the placing or use of information collected by [] third-party cookies" and that such cookies are governed by other companies' "privacy policies and data collection practices." Hausmann Decl., Ex. D.

In view of these extensive disclosures, to plausibly allege lack of consent, Plaintiffs must do far more than the boilerplate allegation that the communications were intercepted "without authorization and consent from Plaintiffs."[1] FAC ¶ 59.

### C. Plaintiffs' agreement to Facebook's policies is relevant.

Finally, Facebook's policies are relevant. Plaintiffs' CIPA theory is that Quest aided and abetted an unlawful interception *by Facebook*. FAC ¶¶ 59-60. If Plaintiffs consented to Facebook's alleged tracking when they created Facebook accounts, there is no basis for aiding and abetting liability. Indeed, Facebook's policies clearly disclose tracking across third-party websites. Moving Br. at 14-16.

---

[1] The Court can and should consider the other website privacy disclosures in the Hausmann and Rigal declarations under the incorporation by reference doctrine. Plaintiffs do not genuinely dispute their authenticity and Plaintiffs' claims are based on the usage and contents of websites where these disclosures are located.

4

Plaintiffs rely heavily on *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778 (N.D. Cal. 2022), but that case is inapposite. First, *Meta Pixel* only involved the collection of data on a patient portal. *Id.* at 784. Plaintiffs here challenge the use of the Pixel on a publicly accessible website (the "General Website") as well as a patient portal (MyQuest). FAC ¶¶ 24-28. The distinction matters when analyzing the viability of Plaintiffs' claims. *Meta Pixel* has no bearing on the fact that Plaintiffs did not and cannot plausibly allege that they did not consent to collection of browsing activity on the General Website under *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 947, 953-55 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018) (Facebook users consented to Facebook collecting information about their browsing public health-related websites like cancer.net). Indeed, "[i]nformation available on publicly accessible websites stands in stark contrast to the personally identifiable patient records and medical histories protected by [HIPAA and California statutory law]." 745 F. App'x at 9. The *Meta Pixel* court recognized "[t]his case is different than *Smith*," which "involved users browsing through websites providing healthcare information to the public at large, not users navigating to patient portals on healthcare providers' websites." 647 F. Supp. 3d at 793.

As to MyQuest, *Meta Pixel* does not apply here because the case focused heavily on HIPAA and found that, under *that* statute a person's mere status as a

5

patient is protected (unlike under CMIA). *See id.* at 791-92. HIPAA consent requirements were at issue in *Meta Pixel* because the plaintiffs specifically alleged claims based on HIPAA violations. *Id*. But Plaintiffs have not done so here—in fact, the FAC does not even *mention* HIPAA.[2]

Second, *Meta Pixel* did not hold that the plaintiffs in that case did not consent. Rather, the court opined on the likelihood of success on the merits for purposes of granting a preliminary injunction and noted, based on a limited evidentiary record, that in its view "it is unlikely that Meta will be able to establish that plaintiffs consented to the data." *Id*. at 794. Plaintiffs have the burden to plausibly allege lack of consent here, and failed to do so.

## II.  Plaintiffs Ignore Their Own Allegations Confirming That Facebook Was a "Party" to the Communications At Issue Under Third Circuit Law.

Likely realizing it is fatal to their CIPA claim, Plaintiffs try to distinguish *In re Google Inc. Cookie Placement Consumer Priv. Litig.*, 806 F.3d 125 (3d Cir. 2015), on its facts and argue that Facebook was not "party" to the communications allegedly intercepted. But missing from Plaintiffs' analysis is a discussion of the actual *facts* they alleged, which confirm *Google Cookie* is directly on point.

---

[2] Plaintiffs' reliance on the December 2022 HHS guidance about HIPAA Rules is misplaced for similar reasons. Additionally, the December 2022 guidance recently underwent material updates and revisions on March 18, 2024. *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited Mar. 20, 2024).

Plaintiffs complain that *after* they communicated with Quest's websites, the Pixel and its associated cookies caused **Plaintiffs'** internet browsers to send a "***second**, secret transmission*" to Facebook "contain[ing] the original GET request" that Plaintiffs' browsers had previously "sent to [Quest]." FAC ¶¶ 16-17 (emphasis added). Regardless of how Plaintiffs try to spin the nature of this communication, it is indisputable that they have alleged it is "**a separate message**" directly between Plaintiffs *and Facebook*, <u>not</u> Plaintiffs and Quest. *Id*. ¶ 16 (emphasis added). In *Google Cookie*, the Court found that "[i]f users' browsers ***directly communicate*** with the [alleged interceptors] about the webpages they are visiting"—*exactly* what Plaintiffs allege here—"then there is no need for the [alleged interceptors] to acquire that information from transmissions to which they are not a party." 806 F.3d at 140-41 (emphasis added). Critically, the Court held that because the alleged interceptors "were parties to any communications that they acquired" there was no unlawful interception or eavesdropping, and no violation of the Wiretap Act *or CIPA*. *Id*. at 143-45, 152. This holding is directly on point here and requires dismissal of Plaintiffs' CIPA claim. Since Facebook was a party to the communications at issue, Facebook did not engage in an unlawful "interception" or "eavesdropping." It necessarily follows that Quest could not have violated CIPA by purportedly "aiding and assisting Facebook's eavesdropping." FAC ¶ 60.

Plaintiffs' reliance on *Popa v. Harriet Carter Gifts, Inc.*, 52 F.4th 121 (3d Cir. 2022), is misplaced because it involved Pennsylvania's wiretapping statute, which the Court held was fundamentally different from the law at issue in *Google Cookie*—the federal Wiretap Act *and CIPA*—as to the party exemption. *Id*. at 129 n.6. Any California decisions that Plaintiffs attempt to rely on for this point are unpersuasive because the Ninth Circuit's interpretation of the party exemption is directly at odds with *Google Cookie*. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 607-08 (9th Cir. 2020) (recognizing that "Courts perform the same analysis for both the Wiretap Act and CIPA regarding the party exemption" and rejecting the Third Circuit's interpretation of the party exemption in *Google Cookie*). This Court is bound to follow the Third Circuit on this issue.

### III. Plaintiffs Have Not Alleged an Interception of Communication "Contents."

No communication "contents" were intercepted during Plaintiffs' use of the General Website because the only interaction alleged is that Plaintiffs viewed the www.questdiagnostics.com home page. FAC ¶¶ 4-5. This simply "identifies the location of a webpage a user is viewing on the internet." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107 (9th Cir. 2014). This information functions like an address and "does not meet the definition of 'contents,' because these pieces of information are not the 'substance, purport, or meaning' of a communication." *Id*. In arguing to the contrary, Plaintiffs rely heavily on the "exemplar" URL in FAC Figure 5 and

8

the ButtonClick and Microdata in FAC Figures 7 and 8, which Plaintiffs insist contain "user-entered and user-specific information that constitutes content." Opp. at 15-17. But there are two fatal flaws with this argument.

First, Plaintiffs did not allege that *they* viewed this "exemplar" URL, nor did they allege an interception of *their* user-entered or user-specific information in the ButtonClick or Microdata. That some putative class member may have viewed the URL in FAC Figure 5 or experienced disclosure of the ButtonClick or Microdata in Figures 7 and 8 cannot be the factual basis for *Plaintiffs* to assert CIPA claims.

Second, Plaintiffs' argument that everything after the ".com" in a URL is "contents" because it reveals details about a specific webpage visited is inconsistent with *Zynga* and *Google Cookie*. *See* Opp. at 16. To be sure, *Zynga* and *Google Cookie* acknowledged circumstances where a URL could amount to a disclosure of communication "contents"—if, for example, it divulged specific search terms a user entered into a search engine. *Zynga*, 750 F.3d at 1108-09; *Google Cookie*, 806 F.3d at 137-39. But *Zynga* rejected the argument that disclosure of a referer header (which includes the URL) automatically constitutes a disclosure of "contents" merely because it discloses specific webpages visited, finding that such URLs "function[] like an 'address,'" and not "content." *Zynga*, 750 F.3d at 1107-08.

9

This same reasoning applies to the "Allergy-Asthma" URL in FAC Figure 5. This URL indicates a user visited a webpage about allergy tests. But there are no allegations in the FAC to suggest that this URL resulted from *user*-inputted search terms, *user* queries, or other *user*-generated material, as opposed to the user merely navigating to the relevant page. Thus, as in *Zynga*, Plaintiffs have failed to allege that the "contents" of any communications were intercepted.[3]

As to MyQuest, Plaintiffs likewise have not plausibly alleged that "contents" of their communications were intercepted. Plaintiffs logged into MyQuest, viewed test results, and logged out. FAC ¶¶ 4-5. Plaintiffs point to FAC Figure 6, which contains the URL "myquest.questdiagnostics.com/results/" followed by an indecipherable string of letters, numbers, and symbols. This "exemplar" URL does not constitute "contents" under *Zynga*. Again, Plaintiffs do not allege that this URL contains *user*-inputted search terms or other *user*-generated material. And, critically, Plaintiffs do not argue that the gibberish after the word "results" reveals an actual medical condition, the specific nature of any test taken, or the test results (much less the identity of the user). Accordingly, the information in FAC Figure 6 does not reveal the "substance, purport, or meaning" of any communication and is not "contents." *See Zynga*, 750 F.3d at 1107-08.

---

[3] For the same reason, Plaintiffs' reliance on *Meta Pixel* is misplaced. *See* Opp. at 17. The transmitted URLs in that case included a search "query string" indicating that the user conducted a search on the website for specific health information (*i.e.*, user-inputted search terms). *Meta Pixel*, 647 F. Supp. 3d at 795-96 & n.10.

### IV.     Plaintiffs Did Not Plausibly Allege Disclosure of "Medical Information."

The mere fact that a user underwent an unidentified test is not "medical information" under CMIA. Indeed, "[c]onfirmation that a person's medical record exists somewhere is not medical information as defined under the CMIA," nor is "the mere fact that a person may have been a patient." *Eisenhower Med. Ctr. v. Superior Court*, 226 Cal. App. 4th 430, 435-36 (Cal. Ct. App. 2014). Instead, to be "medical information," the information must include "***substantive*** information regarding a patient's medical condition or history." *Id.* at 434 (emphasis added).

Plaintiffs rely heavily on *Tamraz v. Bakotic Pathology Assocs., LLC*, 2022 WL 16985001 (S.D. Cal. Nov. 16, 2022), but that case confirms why their CMIA claim fails here. In *Tamraz*, the court denied dismissal because the plaintiffs did, in fact, allege that the ***actual*** "results of test[s]" and the ***specific*** "types of specimens [were] included" in what was disclosed. *Id*. at *5 & n.4. Plaintiffs have not alleged similar facts here. The FAC is devoid of allegations suggesting disclosure of Plaintiffs' actual medical conditions, the types of the tests they took, or the results.

As to whether Plaintiffs sufficiently alleged disclosure of individually identifiable information, they did not for the reasons explained in Quest's Moving Brief at pp. 34-35. Plaintiffs criticize Quest for pointing out the important information about their own personal experiences that is missing from the FAC, which is relevant to their theory that personal identifiers were shared through

11

cookies identified in the FAC. *See* Opp. at 21-22. Notably, Plaintiffs do not argue these missing details are irrelevant or immaterial. Instead, they urge the Court to ignore them as "counterfactual" and based on "supposition" in favor of their (conclusory) allegation that individually identifiable information was disclosed. *Id*. at 21. This argument seeks to turn the *Twombly/Iqbal* standard on its head. It is Plaintiffs who must allege "enough facts" to "nudge [their] claims across the line from conceivable to plausible."[4] *Phillips*, 515 F.3d at 234.

Finally, to satisfy CMIA's definition of "medical information," the individually identifiable information must be "in possession of or derived from a provider of health care." Cal. Civ. Code § 56.05(j). Plaintiffs' theory is that their Facebook IDs and other Facebook identifiers are the individually identifiable information. FAC ¶¶ 30-33. But they do not plausibly allege that this information was ever in Quest's possession or derived from Quest (as opposed to *Facebook*).

## V. Plaintiffs Have Not Plausibly Alleged That Quest Was the Disclosing Party.

Throughout the FAC, Plaintiffs allege that *Facebook* intercepted Plaintiffs' communications with Quest. This is inconsistent with a conclusion that Quest disclosed information to Facebook, which Plaintiffs must plausibly allege to

---

[4] For similar reasons, the Court should dismiss Plaintiff Roche's claim due to her failure to allege that the Pixel was in fact active on Quest's websites at the time of her visit in March 2022. The suggestion that this is "a factual question to be determined through discovery," Opp. at 22, puts the cart before the horse.

support their CMIA claim. Plaintiffs suggest that Quest's mere installation of the Pixel on its website is an affirmative communicative act for purposes of a CMIA disclosure. *See* Opp. at 23-24. But they offer no support for this strained argument. There is a difference between an affirmative disclosure (which Plaintiffs do not plausibly allege) and assisting another's alleged interception of such information (which is Plaintiffs' theory here). *See Sutter Health v. Superior Court*, 227 Cal. App. 4th 1546, 1555-56 (Cal. Ct. App. 2014) (under CMIA, "disclosure occurs when the health care provider affirmatively shares medical information").

Moreover, Plaintiffs allege that *Facebook*—not Quest—owned the cookies that contained the Facebook IDs—which is what Plaintiffs contend are the personal identifiers that allegedly were disclosed. FAC ¶¶ 31-33. But they do not allege that Quest ever obtained this information such that Quest could have disclosed it.[5]

Finally, Plaintiffs have not alleged any facts to suggest that their "medical information" was used for marketing purposes. Indeed, Plaintiffs do not allege that they ever saw ads for Quest or its products on Facebook. Thus, their pleading does not support a CMIA claim based on marketing.

---

[5] *Belozerov v. Gannett Co.*, 2022 WL 17832185 (D. Mass. Dec. 20, 2022), merely rejected an argument that Facebook installed the Pixel because of contrary allegations in the pleading. It did not reject an argument that the defendant did not have access to a Facebook ID such that it could not have disclosed it.

13

## VI.     Plaintiffs' Choice of Law Argument Fails.

Plaintiffs argue that the Court cannot consider the choice of law clause in the MyQuest Account Terms & Conditions because it is not mentioned in the FAC. *See* Opp. at 25. This is wrong. Plaintiffs' claims arise directly from their use of MyQuest. The contract documents governing usage of their MyQuest accounts are integral to the claims and can be considered on a motion to dismiss—indeed, Plaintiffs quote the Cookie Notice in the FAC and concede it is integral. Plaintiffs cannot rely on the parts of the contract they like and ignore the rest. Moreover, on a motion to dismiss courts can always consider "items appearing in the record of the case." *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006). Here, there was prior motion practice and a ruling from Judge Thurston finding that Plaintiffs accepted the Account Terms & Conditions, which include the Cookie Notice and other privacy disclosures. *Cole*, 2023 WL 6201702 at *3. The Court can and should consider this undisputed record.

Plaintiffs next argue that the choice of law clause does not apply because their claims are "untethered" from and "do not require analysis of" the Account Terms & Conditions. Opp. at 25-26. Plaintiffs made this *exact* same argument in opposition to Quest's motion to transfer venue. Judge Thurston rejected it, holding "because Plaintiffs' claims will require interpretation of the [Account] Terms and Conditions in determining the issue of consent, the Court finds the claims are

14

covered by the forum selection clause." *Cole*, 2023 WL 6201702 at *4. There is no basis to reconsider this holding, which is law of the case.

Finally, Plaintiffs argue that the Court should disregard the parties' agreed-upon choice of law because it would be unfair to prevent them from enforcing California statutory rights. This argument disregards Third Circuit law governing choice of law clauses, and the fact that New Jersey courts enforce choice of law clauses in consumer contracts, even in connection with statutory rights.[6] *See, e.g.*, *Halprin v. Verizon Wireless Servs., LLC*, 2008 WL 961239, at *3-5 (D.N.J. Apr. 8, 2008) (enforcing choice law of clause in consumer terms of service in case alleging consumer fraud). Plaintiffs do not argue that application of New Jersey law would be contrary to California public policy, nor have they shown that California has a materially greater interest than New Jersey in the determination of this dispute. As a result, Plaintiffs have not met their burden under Restatement § 187(2) to overcome the New Jersey choice of law clause. *See id.* at *3.

## **CONCLUSION**

For the foregoing reasons and the reasons in Quest's Moving Brief, the Court should dismiss Plaintiffs' claims with prejudice.

---

[6] The prospective waiver doctrine is irrelevant here because it only applies to the waiver of statutory rights under *federal* law, not state law. *See Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238 (3d Cir. 2020) (The prospective waiver doctrine "refers to a situation in which the parties agree that, if disputes arise between them, then they waive the right to rely on federal law. The Supreme Court has observed that such waivers violate public policy.").

15

Dated: March 25, 2024        **FAEGRE DRINKER BIDDLE & REATH LLP**

By: _/s/_     _Matthew J. Fedor_
       Matthew J. Fedor
       Zoe K. Wilhelm

       _Attorneys for Defendant_
       _Quest Diagnostics Incorporated_